**Daniel B. BARNIER, Marie Barnier and Timothy Barnier, Plaintiffs,**

v.

**William SZENTMIKLOSI, Peter Campbell, City of Milan Police Department and City of Milan, Defendants.**

Civ. A. No. 82–60095.

United States District Court,
E.D. Michigan, S.D.

June 9, 1983.

Bruce Wallace, Hooper, Hathaway, Price, Beuche & Wallace, Ann Arbor, Mich., for plaintiffs.

John B. Collins, Collins & McCormick, Ypsilanti, Mich., for defendants.

## MEMORANDUM OPINION

JOINER, District Judge.

On February 2, 1983, at the end of defendants' proofs, the court directed a verdict for defendants on the 42 U.S.C. § 1983

count of plaintiffs' complaint. This memorandum opinion is filed in support of that ruling.

## FACTS

Briefly, the plaintiffs Timothy, Marie and Daniel Barnier filed suit on April 1, 1982 against the City of Milan, the Milan Police Department and two police department officers, William Szentmiklosi and Peter Campbell. The complaint alleged that on May 30, 1981, officers Szentmiklosi and Campbell stopped Timothy Barnier for a traffic violation near his parents' home in Milan, Michigan. They pulled him from his vehicle and beat and choked him with their flashlights and hands. The parents, Marie and Daniel Barnier, heard the commotion and ran outside when they saw their son being beaten. The officers threatened the elder Barniers with arrest, pushed and shoved Marie Barnier, and partially broke in the door to the home after chasing Mr. Barnier inside.

The elder Barniers were later charged with criminal assault and battery. These charges were ultimately dismissed.

Count I of the complaint sought damages, pursuant to 42 U.S.C. § 1983, for deprivations of plaintiffs' Due Process, Equal Protection and Eighth Amendment rights. Counts II through VI were pendent state law claims for, respectively, assault and battery, malicious destruction of private property, false arrest, malicious prosecution, and intentional infliction of emotional distress.

 Only the assault and battery, false arrest, and malicious prosecution claims were submitted to the jury. Plaintiffs voluntarily dismissed their malicious destruction of private property and intentional infliction of emotional distress claims during trial. The § 1983 claim was dismissed on

1. In view of the time and energy expended by the court and the parties before the federal claim was dismissed, the court properly exercised its authority and discretion to try the state law claims by themselves. *Gray v. International Association of Heat and Frost Insulators,* 447 F.2d 1118, 1120 (6th Cir.1971); *Rosado v. Wyman,* 397 U.S. 397, 404–05, 90 S.Ct. 1207, 1213–14, 25 L.Ed.2d 442 (1970).

motion for directed verdict at the close of defendants' proofs as mentioned above. Fed.R.Civ.P. 50(a).[1]

## DISCUSSION

Section 1983 of Title 42 of the United States Code provides as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, or any State or Territory or the District of Columbia, subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

This statute is, of course, remedial only. It provides a remedy for violations of substantive rights, which rights are created by the "Constitution and laws." *Chapman v. Houston Welfare Rights Organization,* 441 U.S. 600, 617–18, 99 S.Ct. 1905, 1916, 60 L.Ed.2d 508 (1979). The Barniers asserted that they were deprived of three Constitutional rights: their Fourteenth Amendment rights to due process of law and the equal protection of the laws, and their Eighth Amendment right to be free of cruel and unusual punishment.

 Clearly, there is no basis for the Eighth Amendment claim. The Constitutional ban against cruel and unusual punishment applies only to those *convicted* of criminal offenses. *U.S. v. Lovett,* 328 U.S. 303, 317–18, 66 S.Ct. 1073, 1079–80, 90 L.Ed. 1252 (1946); *Bell v. Wolfish,* 441 U.S. 520, 535 n. 16, 99 S.Ct. 1861, 1872 n. 16, 60 L.Ed.2d 447 (1979). For persons not convicted of crimes, any deprivation is one of due process only. *Id.* Since plaintiffs were

The jury returned a verdict in favor of Marie Barnier on the malicious prosecution count, and in favor of the defendants on all other counts. The evidence, in the light most favorable to the plaintiff, was sufficient to permit the jury to return this verdict.

not convicted, there could be no Eighth Amendment claim.

■ As for the equal protection claim, it is also ill-founded. There was simply no evidence of any invidious discrimination against the Barniers, who are white. There was also no evidence of any discriminatory intent. *See Washington v. Davis,* 426 U.S. 229, 238–48, 96 S.Ct. 2040, 2046–51, 48 L.Ed.2d 597 (1976). Thus, the directed verdict on those aspects of the § 1983 claim was proper.

Plaintiffs' § 1983 claim, therefore, essentially is one for alleged deprivations of due process of law. The court granted defendants' motion for directed verdict because it found that plaintiffs had adequate remedies under state law and had, therefore, not been deprived of a protected interest *without due process of law.*

Section 1983 was enacted April 20, 1871 as § 1 of the Civil Rights Act of 1871, 17 Stat. 13. That act was passed primarily in response to the increasing Ku Klux Klan terrorism in the South after the Civil War. Section 1, however, was the subject of only limited debate and passed without amendment, while other provisions dealing with civil and criminal penalties for conspiracy and suspension of the writ of habeas corpus produced extensive debate in Congress. *Monell v. Department of Social Services,* 436 U.S. 658, 665, 98 S.Ct. 2018, 2023, 56 L.Ed.2d 611 (1978). Section 1 was, of course, enacted pursuant to § 5 of the Fourteenth Amendment which authorizes Congress to enforce the provisions of that Amendment by appropriate legislation. *Monroe v. Pape,* 365 U.S. 167, 171, 81 S.Ct. 473, 475–76, 5 L.Ed.2d 492 (1961).

For ninety years, the statute which is now § 1983 was moribund. In part, this was a result of restrictive interpretations of the interests protected by the Fourteenth Amendment. *See, e.g., U.S. v. Cruikshank,*

92 U.S. 542, 23 L.Ed. 588 (1876); *Slaughterhouse Cases,* 83 U.S. (16 Wall.) 36, 21 L.Ed. 394 (1873).[2] In part, it resulted from narrow interpretations of the Fourteenth Amendment's "state action" requirement. *See, e.g., Barney v. City of New York,* 193 U.S. 430, 438–39, 24 S.Ct. 502, 503–04, 48 L.Ed. 737 (1904); *Civil Rights Cases,* 109 U.S. 3, 17, 3 S.Ct. 18, 25, 27 L.Ed. 835 (1883) (dictum). Thus, executive and judicial conduct sanctioned by the state was "state action", but conduct by state officers in violation of their authority was not.[3] Underlying all this was the Supreme Court's desire—and possibly the desire of the nation at large other than the freedmen—to maintain the old federalism in which the central government would have little responsibility, if any, for protecting civil liberties. *See generally, Developments in the Law—Section 1983 and Federalism,* 90 Harv.L.Rev. 1133 (1977).

It was impossible, of course, for post-Civil War America to transform itself back into antebellum America. The country had been forever changed by a bitter Civil War and the abolition of slavery. Equally significant, the prewar economic order was steadily eroding and being rapidly replaced with an industrial economy of national scope. The conflicts between a Supreme Court bent on maintaining traditional notions of federalism, and a Congress (and later an executive as well) determined to expand the role of the federal government are well-known to lawyers and laymen alike.

However, while federal supremacy in the area of economic regulation was largely established by the late 1930's, *see, e.g., NLRB v. Jones & Laughlin Steel Corp.,* 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893 (1937), an affirmative federal role in protecting and enforcing individual liberties was slower to emerge. Section 1983 plaintiffs did achieve some successes in the 1920's and 1930's.

**2.** Selective incorporation of the Bill of Rights into the Fourteenth Amendment came much later during the 1950's and 1960's. *See, e.g., Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

**3.** "State action" and "under color of law" have been equated almost from the first. The Supreme Court formally confirmed this in *U.S. v. Price,* 383 U.S. 787, 794, 86 S.Ct. 1152, 1157, 16 L.Ed.2d 267 n. 7 (1966).

*See, e.g., Nixon v. Herndon,* 273 U.S. 536, 47 S.Ct. 446, 71 L.Ed. 759 (1927); *Lane v. Wilson,* 307 U.S. 268, 59 S.Ct. 872, 83 L.Ed. 1281 (1939); *Hague v. CIO,* 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939). However, § 1983 was largely limited to vindicating deprivations of voting rights during these years.

In *U.S. v. Classic,* 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941) and *Screws v. U.S.,* 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945), the Supreme Court expanded the meaning of "under color of law" to acts done in violation of state law where the wrongdoer is clothed with the authority of state law. Both *Classic* and *Screws* were prosecutions under the criminal provisions of the Civil Rights Acts but, with hindsight, clearly portend § 1983's later resurrection.

*Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961) ushered in the modern era of § 1983 jurisprudence. The *Monroe* plaintiffs—six black children and their parents—alleged that 13 Chicago police officers broke into their home, routed them from bed, made them stand naked in the living room, and ransacked every room, all without a search or arrest warrant. They also alleged that Mr. Monroe was taken to the police station and detained for 10 hours on "open" charges while being interrogated about a two-day old murder, that he was not taken before a magistrate, that he was not permitted to call his family or an attorney, and that he was ultimately released without being charged. Plaintiffs sued both the City of Chicago and the police officers for damages under § 1983, alleging that the defendants acted "under color of law" to deprive them of their Fourth and Fourteenth Amendment right to be free of unreasonable searches. The District Court dismissed the complaint and the Seventh

Circuit affirmed. *Monroe v. Pape,* 272 F.2d 365 (7th Cir.1959).

The Supreme Court affirmed the dismissal of the City,[4] but reversed as to the individual police officers. Justice Douglas, writing for the court, first held that the police officers' actions violated plaintiffs' constitutional rights. *Wolf v. Colorado,* 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949); *Elkins v. U.S.,* 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960). He then relied on *U.S. v. Classic,* and *Screws v. U.S.,* to expand the scope of "under color of law" to include an official's abuse of his position.

In reaching these conclusions, Justice Douglas relied heavily on the legislative history of the statute. He found that the statute had three main purposes: to override state laws which impinged on Constitutional rights and privileges; to provide a federal remedy where the remedy provided by state law was inadequate; and to provide a federal remedy where the state remedy, though adequate in theory, was not available in practice. 365 U.S. 173–74, 81 S.Ct. at 476–77. These three purposes, coupled with the general language of the statute, led Justice Douglas to conclude that the adequacy of any state remedy was irrelevant.

> The federal remedy is supplementary to the state remedy, and the latter need not be first sought and refused before the federal one is invoked. 365 U.S. at 183, 81 S.Ct. at 482.[5]

*Monroe* led to an extraordinary increase in the civil rights caseload of the federal courts. In 1960, about 300 cases were filed under *all* the civil rights acts. *Administrative Office of the United States Court, 1960 Annual Report of the Director* 232, table

---

**4.** Based on the legislative history, the Court concluded that Congress had not intended to include municipal corporations within the ambit of § 1983. Not until 1978 did the Court partially abrogate this immunity for municipalities. *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). The *Monell* Court reread the legislative history and concluded that there was no clear indication that Congress intended to exclude

municipalities from the meaning of "persons" covered by § 1983.

**5.** Although this conclusion does not necessarily follow, neither Justice Frankfurter in dissent, nor Justice Harlan in concurrence discussed the significance of the adequacy of state remedies. *See Developments in the Law—Section 1983 and Federalism,* 90 Harv.L.Rev. 1133, 1171 n. 218 (1977).

C2. In 1972, approximately 8000 suits were filed under § 1983 alone. *See* McCormack, *Federalism and Section 1983,* 60 Va.L.Rev. 1, 1 n. 2 (1974). For the twelve months ending June 30, 1982, more than 17,000 cases, of a total federal civil caseload of more than 206,000 were civil rights cases.[6] This does not include an estimated 17,000 civil rights petitions filed by state and federal prisoners. *See The United States Courts, A Pictorial Summary 1982* 10–11. Thus, the total number of civil rights cases commenced during the 1982 fiscal year exceeded 34,000, or 16.5% of the total civil caseload.

■ A § 1983 claim has two elements. First, the plaintiff must show that some person has deprived him of a *federal* right, either statutory or Constitutional. Second, the plaintiff must prove that that person acted under color of state or territorial law. *Gomez v. Toledo,* 446 U.S. 635, 640, 100 S.Ct. 1920, 1923, 64 L.Ed.2d 572 (1980). One reason for the explosion in civil rights litigation is certainly *Monroe v. Pape's* expansive interpretation of "under color of law". Indeed, it is inconceivable that § 1983 could ever have been an effective civil rights enforcement tool without that broad interpretation. However, another reason for the phenomenal increase in civil rights litigation is the courts' failure to adequately clarify the federal "rights, privileges and immunities" remediable under § 1983.

The statute itself states that a remedy is provided for "deprivation[s] of any rights, privileges, or immunities secured by the *Constitution and laws.*" The phrase "and laws" was long assumed to include claims based solely on violations of federal statutory law. *See, e.g., Hague v. CIO,* 307 U.S.

496, 525–26, 59 S.Ct. 954, 968–69, 83 L.Ed. 1423 (1939) (Stone, J. concurring); *Edelman v. Jordan,* 415 U.S. 651, 675, 94 S.Ct. 1347, 1361, 39 L.Ed.2d 662 (1974) (dicta). However, not until *Maine v. Thiboutot,* 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980), did the Supreme Court make clear that "and laws" included claims based on any federal statute.[7] There is no claim in this case that plaintiffs were deprived of any federal statutory right or privilege.

As for "the Constitution", the cases seem to be of two sorts. First, there are the § 1983 actions based on violations of specific provisions of the Bill of Rights, and other substantive guarantees such as the equal protection clause. These include actions against state officials, cognizable by virtue of a particular amendment's incorporation into the Fourteenth Amendment. *See, e.g., Egan v. City of Aurora,* 365 U.S. 514, 81 S.Ct. 684, 5 L.Ed.2d 741 (1961) (per curiam) (First Amendment—deprivation of speech and assembly); *Duncan v. Nelson,* 466 F.2d 939 (7th Cir.1972) (Fifth Amendment—coerced confession); *Weatherford v. Bursey,* 429 U.S. 545, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977) (Sixth Amendment—interference with attorney-client privilege); *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (Eighth Amendment—cruel and unusual punishment). For the most part, these cases are not analytically troublesome.

The second sort of Constitutional case is the pure *procedural* due process case, the § 1983 action which alleges a violation of the Due Process Clause of the Fourteenth Amendment,[8] but is not based on any other specific Constitutional provision.[9] *See gen-*

---

**6.** Unfortunately, separate statistics for § 1983 actions alone are not available. However, this court's experience has been that virtually every civil rights action commenced in the district court includes a § 1983 claim. *See also,* Whitman, *Constitutional Torts,* 79 Mich.L.Rev. 5, 6 n. 9 (1980).

**7.** Cf. *Chapman v. Houston Welfare Rights Organization,* 441 U.S. 600, 99 S.Ct. 1905, 60 L.Ed.2d 508 (1979).

**8.** "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; *nor shall any state deprive any person of life, liberty or property, without due process of law.*" U.S. Const. amend. XIV, § 1.

**9.** Obviously, many § 1983 complaints allege deprivations of more than one Constitutional right, privilege or immunity. Nevertheless, it is analytically useful to separate the claims asserted under the procedural wing of the due process clause from all others.

*erally,* Nahmoud, *Section 1983 and the "Background" of Tort Liability,* 50 Ind.L.J. 5, 8–9 (1974). This appears to be the source of the § 1983 flood which threatens to engulf the federal courts, and has occurred 1) because the courts have not adequately defined the "property" and "liberty" interests protected by the Due Process Clause [10] and, more importantly, 2) because they have failed to recognize that even if a protected interest is implicated, the deprivation must be accomplished *without due process of law.*

The Supreme Court has recently attempted to clarify the meaning of "liberty" and "property." *See, e.g., Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976); *Ingraham v. Wright,* 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977).[11] More significantly for purposes of this opinion, the Court has also attempted to clarify the meaning of "due process of law" and thereby define the scope of § 1983 actions based on the due process clause of the Fourteenth Amendment. Since the basis for the granting of defendants' motion for directed verdict was that plaintiffs were not deprived of a protected interest *without due process of law,* a brief review of these recent Supreme Court decisions is in order.

In *Ingraham v. Wright, supra,* the Supreme Court addressed the issue whether traditional common law tort remedies provided due process under the Fourteenth Amendment in the context of corporal punishment in the classroom, given that students' "liberty" interests were implicated by the infliction of such punishment. The Court analyzed three factors. First, it examined the substantiality of the childrens' liberty interest in avoiding infliction of corporal punishment. The Court found that for historical reasons school children had a "strong" interest in procedural safeguards that would minimize the risk of wrongful punishment and permit resolution of disputed questions of justification. 430 U.S. at 675–76, 97 S.Ct. at 1414–15.

The Court next examined the safeguards provided under state law. It found that state procedures requiring an initial determination of the propriety of corporal punishment, coupled with civil tort remedies, afforded significant protection against the infliction of unjustified corporal punish-

---

**10.** The Fourteenth Amendment also protects against deprivations of "life" without due process of law. However, since "life" has *basically* only one legal meaning and is not subject to multiple interpretations, it is not a source of judicial confusion.

**11.** In *Board of Regents v. Roth,* the Court noted that the "range of interests protected by procedural due process is not infinite." It held that no liberty or property interest was implicated where a nontenured college teacher without a formal contract was not rehired after a one year term of service. It stated that a "property" interest requires more than an abstract need or desire, or a unilateral expectation. It requires a "legitimate claim of entitlement." 408 U.S. at 577, 92 S.Ct. at 2709. It broadly defined "liberty" as not only freedom from bodily restraint, but also:

"[t]he right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those

privileges long recognized . . . as essential to orderly pursuit of happiness by free men." [quoting from *Meyer v. Nebraska,* 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042] 408 U.S. at 572, 92 S.Ct. at 2706.

In *Paul v. Davis,* the court held that reputation alone, without some more tangible interest such as employment, is neither a "liberty" nor a "property" interest within the meaning of the Fourteenth Amendment. Although the Court recognized that state law is the source of many liberty and property interests, *see, e.g., Bell v. Burson,* 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971); *Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), it found no state law which guaranteed Mr. Davis the present enjoyment of reputation. The interest was *protected* against injury by the state's tort law, but the interest was not affirmatively *created* by state law.

Finally in *Ingraham v. Wright,* the Court, while suggesting that there is a *de minimis* level of imposition with which the Constitution is not concerned, stated that "liberty" interests are otherwise implicated whenever state authorities bodily restrain or punish an individual.

ment.[12] It found no reason to supplement the common law remedies with additional prior notice and hearing requirements, particularly since the state had preserved what " 'has always been the law of the land.' "[13] 430 U.S. at 679, 97 S.Ct. at 1416.

Finally, the Court engaged in a cost-benefit analysis. It found that, even assuming the need for advance procedural safeguards was clear, the cost in terms of intrusion into school administration outweighed the marginal reduction in incidents of unnecessary or excessive corporal punishment which could be expected. 430 U.S. at 680–82, 97 S.Ct. at 1417–18.

*Baker v. McCollan,* 443 U.S. 137, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979) was a case of mistaken identity. The plaintiff was arrested on a facially valid warrant, actually intended however for his brother. The mistake was made because the brother used plaintiff's driver's license (adorned with the brother's picture) to identify himself when arrested and booked sometime earlier. The plaintiff was jailed for eight days before officials compared his appearance with a file photograph of the wanted man and released him. The plaintiff sued for damages under § 1983 for deprivation of liberty without due process of law. The suit did not attack the validity of the warrant, but seemed rather to challenge the adequacy of the sheriff's identification procedures.

The Court found the state's procedures adequate, even though they obviously did not eliminate the possibility of error. Since the procedures used were adequate, the plaintiff had not been deprived of liberty "without due process of law." 443 U.S. at 145–46. Although it does not seem integral

to the holding, the Court made clear that it was aware of existing common law tort remedies.

Finally, there is *Parratt v. Taylor,* 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981). In *Parratt* a prison inmate sued for damages under § 1983 for deprivation of property without due process of law when a hobby kit he had ordered and paid for from his prison account was negligently lost by prison employees. The Court readily found that there had been a deprivation of property under color of law.[14] It then grappled directly with the crucial question, i.e., whether the deprivation had occurred without due process of law. The Court first recognized that state *postdeprivation* remedies could satisfy due process. *See, e.g., North American Cold Storage Co. v. Chicago,* 211 U.S. 306, 29 S.Ct. 101, 53 L.Ed. 195 (1908). This was particularly important in the context of a negligent deprivation—and it is equally important in the context of an assaultive-type deprivation—as a predeprivation hearing would be meaningless. The Court then examined state law to determine the adequacy of its postdeprivation remedies. Even though the state's tort claims remedies might not have provided relief identical to that available under § 1983, the Court found them sufficient to satisfy the requirements of due process, since the tort remedies could have fully compensated the inmate for his loss.

A number of lower courts have attempted to distinguish *Parratt* and limit the scope of its reasoning on the ground that *Parratt* involved a *negligent* deprivation. *See, e.g., Madyun v. Thompson,* 657 F.2d 868, 873 (7th

---

**12.** The Court also opined that criminal sanctions for maliciously inflicted punishment would tend to deter teachers and school administrators from inflicting unnecessary or excessive corporal punishment. 430 U.S. at 678, 97 S.Ct. at 1416. While this may be true, it is difficult to understand how this bears on the process due to the *plaintiff children.*

**13.** This particular portion of the opinion is difficult to comprehend. The issue is whether administrative safeguards should be added to traditional common law remedies. It seems circular to argue that they should not because the

state "has preserved what 'has always been the law of the land,' " i.e., the traditional common law remedies.

**14.** *Parratt* would seem to have been a classic case for application of the *de minimis* exception alluded to in *Ingraham v. Wright,* 430 U.S. 651, 674, 97 S.Ct. 1401, 1414, 51 L.Ed.2d 711 (1977), i.e., that *de minimis* deprivations of liberty or property are no deprivations. That the court chose not to treat the deprivation as *de minimis* casts doubt on the existence of such an exception.

Cir.1981) (prisoner claims for negligent deprivations of personal property caused by delays in prison administrative system and negligent recordkeeping remanded for consideration of *Parratt;* allegations of intentional taking of property held to state claim); *Peters v. Township of Hopewell,* 534 F.Supp. 1324, 1333–34 (D.N.J.1982) (action against municipality for destruction of property not dismissed where complaint alleged that municipality acted deliberately or with reckless disregard); *McCowen v. City of Evanston,* 534 F.Supp. 243, 249 (N.D.Ill.1982) ("intentional or reckless deprivation of property remains actionable under § 1983 even when state law offers the possibility of after-the-fact monetary relief"); *Tarkowski v. Hoogasian,* 532 F.Supp. 791, 795 (N.D.Ill.1982) ("We do not read *Parratt* as going beyond its own facts. The Court, in *Parratt,* certainly did not repeal section 1983 in cases in which a state official's intentional deprivation of constitutional rights including property rights is involved simply because a state tort action may be available."); *Ragusa v. Streator Police Dept.,* 530 F.Supp. 814 (N.D.Ill.1981) (claim for negligent deprivation dismissed on basis of *Parratt;* claim for intentional misconduct not dismissed). *See also, Parratt v. Taylor, supra* (Blackmun, J. concurring).

However, there is nothing in *Parratt* to suggest that its holding is limited to negligent deprivations. Indeed, the Court suggested it saw no distinction between negligence and other states of mind when it stated:

Nothing in the language of § 1983 or its legislative history limits the statute solely to intentional deprivations of constitutional rights. 451 U.S. at 534, 101 S.Ct. at 1912.

Furthermore, to limit *Parratt's* reasoning to negligent deprivations is to completely ignore *Ingraham v. Wright. See generally,* Note, *Prisoner Property Deprivations: Section 1983 and the Fourteenth Amendment,* 52 Ind.L.J. 257 (1976).

Another group of cases seems to suggest that *Parratt* may be limited to deprivations of property and cannot be extended to deprivations of liberty. *See, e.g., Richardson v. Fleming,* 651 F.2d 366, 372 n. 10 (5th Cir. 1981); *Schiller v. Strangis,* 540 F.Supp. 605, 615 (D.Mass.1982); *Scott v. Donovan,* 539 F.Supp. 255, 258 (N.D.Ga.1982); *Howse v. DeBerry Correctional Institute,* 537 F.Supp. 1177, 1178 (M.D.Tenn.1982) ("This Court does not believe that the Supreme Court intended the rationale of *Parratt* to extend beyond facts basically similar to those in that case—that is, when only a *negligent* deprivation of *property* is involved.") *Howse v. DeBerry Correctional Institute* expressly relied on Justice Blackmun's concurring opinion in *Parratt,* in which he indicated he did not read the majority's opinion as "applicable to deprivations of life or liberty." 451 U.S. at 545, 101 S.Ct. at 1918. However, Justice Blackmun's concurrence is not the opinion of the Court.[15] Furthermore, there is no logical reason to distinguish "property" and "liberty" for purposes of determining whether the state has provided due process[16] and such a distinction

---

**15.** Justice Rehnquist's majority opinion was joined without comment by Justices Burger, Brennan and Stevens. Justices Blackmun and White concurred to make clear that they thought the Court's opinion was limited to negligent deprivations of property. Justice Powell concurred only in the result. He wrote separately to make clear that he understood a "deprivation" to require an intentional act. Justice Marshall concurred in part and dissented as to the Court's determination that the state remedy was adequate. Finally, Justice Stewart weighed in with a brief concurrence, although it is unclear whether he agreed with Justice Powell that negligent acts cannot constitute deprivations or whether he felt the deprivation

was *de minimis* and therefore not of Constitutional proportions. Thus, of the nine justices, only two were concerned to expressly limit the reach of the holding to negligent deprivations of property.

**16.** Arguably, the process due might differ depending on which protected interest is infringed. However, there would appear to be no sound reason to alter the *Parratt* analysis—has the state provided remedial processes which comport with due process requirements—on the basis of the interest infringed.

It has been suggested that property deprivations are different from liberty deprivations because the state action is not complete when the

would be contrary to *Ingraham v. Wright.* *See* Kirby, *Demoting 14th Amendment Claims to State Torts,* 68 A.B.A.J. 166, 170 (1982).

Those cases which have extended the reasoning of *Parratt* and *Ingraham* to intentional or reckless deprivations of liberty or property appear to be the sounder, more well-reasoned cases. *See, e.g., Palmer v. Hudson,* 697 F.2d 1220, 1222–23 (4th Cir. 1983) (intentional destruction of a prisoner's property); *Engblom v. Carey,* 677 F.2d 957, 964–66 (2d Cir.1982) (striking corrections officers evicted from facility-residences without notice or consent); *Ellis v. Hamilton,* 669 F.2d 510, 514–16 (7th Cir.1982) (children removed from home of natural and adoptive grandparents by county welfare officers and placed for adoption with strangers), *cert. denied,* —— U.S. ——, 103 S.Ct. 488, 74 L.Ed.2d 631 (1983); *Rutledge v. Arizona Board of Regents,* 660 F.2d 1345, 1352 (9th Cir.1981), *affd. on other grounds sub nom. Kush v. Rutledge,* —— U.S. ——, 103 S.Ct. 1483, 75 L.Ed.2d 413 (1983); *Holmes v. Wampler,* 546 F.Supp. 500, 503–04 (E.D.Va.1982) (defendant doctor alleged to have willfully, or with gross negligence, released dangerous patient who subsequently knifed plaintiff); *Frazier v. Collins,* 538 F.Supp. 603, 605 (E.D.Va.1982) (intentional withholding of a prisoner's property); *Spriggs v. City of Chicago,* 523 F.Supp. 138, 143 n. 5 (N.D.Ill.1981) (plaintiff beaten by city police officers); *Meshkov v. Abington Township,* 517 F.Supp. 1280, 1285–86 (E.D.P.1981) (jailers alleged to have been negligent in permitting detainee to commit suicide); *Sheppard v. Moore,* 514 F.Supp. 1372, 1375–78 (M.D.N.C.1981) (willful refusal to return property seized as part of criminal investigation).

state stands ready to cure the property loss. *See* Casenote, *Civil Rights—42 U.S.C. § 1983 Due Process Requirements for Negligent Property Deprivations,* 28 Wayne L.Rev. 1491, 1518–19 (1982). This distinction is a chimera. The constitutional deprivation is complete whenever the loss occurs, be it liberty or property. The only question at that point is whether it has occurred without due process. If the state remedies are adequate, it has not.

*Rutledge, supra,* is particularly instructive. In that case, the coach of the Arizona State University football team was alleged to have assaulted and battered one of his players. The player sued in federal court for damages under § 1983 for deprivation of his Fourteenth Amendment "liberty" interests. The Ninth Circuit, per Judge Sneed, dismissed the claim:

[W]e may assume, without deciding, that the alleged assault and battery deprived the appellant of "liberty" within the meaning of the Fourteenth Amendment and focus our attention on whether this was done "without due process of law." Obviously the assumed deprivation was not, nor could it have been, accompanied by a predeprivation hearing. That being so, the issue is whether the postdeprivation hearing available to the appellant under the law of the State of Arizona satisfies the due process requirement of the Fourteenth Amendment.

We hold that it does. The Supreme Court in *Parratt v. Taylor* indicated that when no practical way to provide a predeprivation hearing exists, a postdeprivation hearing provided at a "meaningful time and in a meaningful manner" will suffice. The issue becomes merely whether the remedies available under Arizona law and in the Arizona courts constitute the postdeprivation hearing required by the Fourteenth Amendment ... In the instant case, since appellant has sought redress in the Arizona state courts, and in the absence of suggestion that the postdeprivation procedures under state law are deficient, we must conclude that the alleged deprivation was not without due process of law. That the effect of our holding is to relegate appellant to his tort law remedy under Arizona

It has also been suggested that § 1983 is an important deterrent to intentional unconstitutional actions by state officials. If state tort remedies are adequate, which by definition they must be if the deprivation is to have occurred *with* due process, then it is difficult to understand why § 1983 should be any more of a deterrent than state tort law.

law for Kush's alleged assault and battery should surprise no one. That is the consequence of *Parratt v. Taylor* as applied to this action of Kush. 660 F.2d at 1352.

■ Likewise in this case. It was not possible for the State of Michigan to provide the Barniers notice and a hearing *before* they were deprived of their "liberty" by the defendants.[17] The issue, therefore, is whether the process provided by the State of Michigan *after* the deprivation comports with Constitutional requirements. Clearly it does. It provided plaintiffs a panoply of tort remedies, including assault and battery, false arrest, and malicious prosecution, which plaintiffs quite properly asserted in their complaint. Furthermore, plaintiffs' claims were vindicated, at least in part, by the jury's verdict on the malicious prosecution count of the complaint.[18] There is no suggestion, nor does the court think there reasonably could be, that those state tort remedies are in any way inadequate.[19]

Therefore, plaintiffs were not deprived of any protected liberty interest *without due process of law* and dismissal of their § 1983 claim on motion for directed verdict was proper.

■ It is proper to point out what this opinion does *not* do. It does not require

dismissal of claims based on the *substantive* aspects of the due process clause. Unlike procedural due process, which permits a state to deprive a person of life, liberty or property when it does so with due process of law, substantive due process imposes limits on what a state may do *regardless* of what process is provided. It is a source of rights which may not be taken away under any circumstances; thus, it is entirely logical that § 1983 should provide a means to vindicate those rights, notwithstanding that state law may provide adequate remedies.[20]

Substantive due process is a nebulous concept at best. It seems to have its origins in Justice Cardozo's notion of immunities "implicit in the concept of ordered liberty." *Palko v. Connecticut,* 302 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937). *See also, Snyder v. Massachusetts,* 291 U.S. 97, 105, 54 S.Ct. 330, 332, 78 L.Ed. 674 (1934) (Cardozo, J.) (immunities "so rooted in the traditions and conscience of our people as to be ranked as fundamental"). In *Rochin v. California,* 342 U.S. 165, 172, 72 S.Ct. 205, 209, 96 L.Ed. 183 (1952), Justice Frankfurter seemed to establish a standard that conduct "that shocks the conscience" or "offends the community's sense of fair play and decency" is prohibited by the due process clause of the Fourteenth Amendment. *Irvine v. California,* 347 U.S. 128, 74 S.Ct.

---

**17.** Like the *Rutledge* court, this court assumes, without finding it necessary to decide, that the defendants' actions exceeded the *de minimis* level alluded to in *Ingraham v. Wright* and, therefore, implicated plaintiffs' Fourteenth Amendment liberty interests.

**18.** The court does not suggest, of course, that a plaintiff must necessarily recover on a state law claim before the court can declare that due process has been provided. "The fundamental requirement of due process is the opportunity to be heard and it is an 'opportunity which must be granted at a meaningful time and in a meaningful manner.' *Armstrong v. Manzo,* 380 U.S. 545, 552 [85 S.Ct. 1187, 1191, 14 L.Ed.2d 62] (1965)." *Parratt v. Taylor, supra,* 451 U.S. at 540, 101 S.Ct. at 1915.

**19.** Even if state tort law provided less relief than would be available under § 1983, the court's holding would be the same so long as the state remedies were "adequate to satisfy

the requirements of due process." *Parratt v. Taylor,* 451 U.S. at 544, 101 S.Ct. at 1917; *Kumar v. Marion County Common Pleas Court,* 704 F.2d 908, 910 (6th Cir.1983). For example, punitive damages may be more readily available under federal law than under state law. *Compare Smith v. Wade,* —— U.S. ——, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983) with *Bailey v. Graves,* 411 Mich. 510, 309 N.W.2d 166 (1981). This does not mandate a different result since plaintiffs could still be adequately compensated under state law.

**20.** It goes without saying that this opinion does not apply to deprivations of other substantive constitutional rights, such as the fourth amendment, *Wolf-Lillie v. Sonquist,* 699 F.2d 864, 871–72 (7th Cir.1983), the right to privacy, *Palmer v. Hudson,* 697 F.2d 1220, 1223–25 (4th Cir.1983), the right to vote, *Duncan v. Poythress,* 657 F.2d 691, 704–05 (5th Cir.1981), *cert. granted,* 455 U.S. 937, 102 S.Ct. 1426, 71 L.Ed.2d 647 (1982), and so forth.

381, 98 L.Ed. 561 (1954) appears to limit the *Rochin* standard to cases involving coercion, violence or brutality to the person.

Whatever the difficulties of applying such a standard, it appears to be well-rooted in our jurisprudence. Justice Blackmun, concurring in *Baker v. McCollon, supra,* 443 U.S. at 148, 99 S.Ct. at 2696, stated that he did not understand the Court's decision in that case to foreclose the possibility that the conduct of the police officers might be challenged under § 1983 as "shocking to the conscience." He reiterated this view in *Parratt v. Taylor,* in a short opinion in which Justice White concurred:

> I also do not understand the Court to intimate that the sole content of the Due Process Clause is procedural regularity. I continue to believe that there are certain governmental actions that, even if undertaken with a full panoply of procedural protection, are, in and of themselves, antithetical to notions of due process. 451 U.S. 545, 101 S.Ct. at 1918.

Justice Powell also opined in *Parratt* that "the Due Process Clause imposes substantive limitations on state action, and under proper circumstances these limitations may extend to intentional and malicious deprivations of liberty and property even where compensation is available under state law." 451 U.S. at 552–53, 101 S.Ct. at 1921–22. *See also, Ingraham v. Wright, supra,* 430 U.S. at 679 n. 47, 97 S.Ct. at 1416 n. 47.

The lower courts have also recognized the reality of substantive due process and have not hesitated to attempt to give it meaning. *See, e.g., Hall v. Tawney,* 621 F.2d 607, 613 (4th Cir.1980) (substantive due process means "the right to be free of state intrusions into realms of personal privacy and bodily security through means so brutal, demeaning, and harmful as literally to shock the conscience of a court"); *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.1973) ("In determining whether the Constitutional line has been crossed, a court must look to such factors as the need for the application of force, the relationship between the need and the amount of force that was used, the extent of injury inflicted, and whether the force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm."); *Jenkins v. Averett,* 424 F.2d 1228, 1232 (4th Cir.1970) ("Injuries arbitrarily inflicted by the police are constitutionally cognizable and remediable.").

■ The post-*Parratt v. Taylor* cases also recognize a distinction between substantive and procedural due process. They agree that *Parratt's* reasoning does not apply to alleged deprivations of substantive due process.[21] *Duncan v. Poythress,* 657 F.2d 691, 704–05 (5th Cir.1981) (claim that state official's refusal to hold election required by state law violated plaintiffs' substantive due process rights held not barred by *Parratt*), *cert. granted,* 455 U.S. 937, 102 S.Ct. 1426, 71 L.Ed.2d 647 (1982); *Holmes v. Wampler, supra,* at 504–06 (dicta); *Irshad v. Spann,* 543 F.Supp. 922, 926 (E.D.Va. 1982) (dicta); *Martin v. Covington, Kentucky,* 541 F.Supp. 803, 804 (E.D.Ken.1982) (claim that minor forced by police officers to engage in homosexual solicitation to assist in crackdown on homosexual prostitution held not barred by *Parratt*); *Schiller v. Strangis, supra,* at 615–17 (claim that police officer used excessive force to arrest plaintiff apparently held to violate substantive due process protections); *Howse v. DeBerry Correctional Institute, supra,* at 1180 (prisoner's claim that guard used undue violence held not barred by *Parratt,* in part because claim based on substantive due process guarantees).

■ In addition to not barring claims alleging deprivations of substantive due process, this opinion does not bar procedural due process claims where an established state procedure is itself the source of the deprivation. *Logan v. Zimmerman Brush Co.,* 455 U.S. 422, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982) (challenge to state law which

---

21. Of course, a substantive due process claim, like any other claim, is subject to summary judgment if the facts are not genuinely in dispute and the court can say as a matter of law that the state conduct is not shocking to the conscience. Fed.R.Civ.P. 56.

operated to extinguish property interest in discrimination claim where state commission failed, for whatever reason, to convene factfinding conference); *Wakinekona v. Olim,* 664 F.2d 708 (9th Cir.1981), *rev'd on other grounds,* —— U.S. ——, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983) (attack on state regulations governing interstate transfers of prisoners); *Pantoja v. City of Gonzales,* 538 F.Supp. 335 (N.D.Calif.1982) (claim based on city's practices and procedures for handling persons taken into custody under state public intoxication law); *Toins v. Ignash,* 534 F.Supp. 452 (E.D.Mich. 1982) (city police department policy of not returning seized property challenged as violation of due process). *See also, Parratt v. Taylor, supra,* 451 U.S. at 537, 101 S.Ct. at 1914 (distinguishing cases where deprivation "was pursuant to some established state procedure").

■ Furthermore, even § 1983 suits which allege deprivations of procedural due process cannot be blindly dismissed. The court must carefully examine state remedies and assure itself that they are constitutionally adequate. *Graham v. Mitchell,* 529 F.Supp. 622 (E.D.Va.1982). *Cf. Eberle v. Baumfalk,* 524 F.Supp. 515 (N.D.Ill.1981) (§ 1983 action alleging negligent infliction of injury by police officer dismissed, even though under Illinois law police officer was immune from suit).

■ The court's opinion does not run counter to *Monroe v. Pape's* holding that the § 1983 remedy "is supplementary to the state remedy, and that the latter need not be first sought and refused before the federal one is invoked." 365 U.S. at 183, 81 S.Ct. at 482. That continues to be the case

where a *Constitutional* deprivation is alleged. This court simply holds, logically following *Ingraham v. Wright* and *Parratt v. Taylor,* that where the state is prepared to adequately remedy the loss of an interest protected by the Fourteenth Amendment, no Constitutional deprivation is alleged. In other words, if there is no lack of due process, there is no cause of action under § 1983 for deprivation of due process.[22]

Finally, this opinion is not only supported by Supreme Court precedent, it is also in accord with sound principles of judicial administration.

One such principle is that for every wrong there is a remedy. In this case, there were multiple remedies available under state law and so the principle is not violated if no *federal* remedy is available.

A second principle is conservation of judicial resources. Since state law already provides remedies for injuries such as those suffered by the Barniers, it is wasteful to provide additional remedies. To do otherwise encourages multiple litigation and undesirable forum shopping.

The tribunals of Michigan are fully capable of fairly deciding the problems presented by cases such as this. The procedures are simple, the judges are responsible, and the juries are chosen from essentially the same pool as are federal juries. Justice will not be denied if plaintiffs are forced to rely on state tort remedies.

One final comment is in order. The decision in this case came too late. It should have been made earlier in response to a motion to dismiss or for summary judgment, when it became clear that 1) the only

---

**22.** A panel of the Sixth Circuit seems to have misunderstood this very point in *Wilkerson v. Johnson,* 699 F.2d 325 (6th Cir.1983). The court there stated in dicta:

> [T]he holding in *Parratt* must be construed in light of the Supreme Court's recent decision in *Patsy v. Board of Regents of State of Florida* [457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172] (1982). In that case, the Court held that § 1983 plaintiffs need not exhaust state administrative remedies before bringing an action in federal court. Since the decision in *Monroe v. Pape,* 365 U.S. 167 [81 S.Ct.

473, 5 L.Ed.2d 492] (1961), it has been the rule that a § 1983 plaintiff need not attempt to vindicate his or her claim in state court before asserting it in federal court. To apply the holding of *Parratt* outside the prisoners' rights context is inconsistent with *Monroe* and *Patsy.* 699 F.2d at 329.

The non-exhaustion requirement is still the law. However, application of *Parratt* outside the prisoner rights' context is not inconsistent with *Monroe* and *Patsy* because *Parratt* defines the contours of a constitutional right, *not* the scope of the § 1983 damage remedy.

federal claim was for violation of procedural due process, and 2) the state remedies were adequate to compensate plaintiffs for their loss. Had the issue been raised earlier as it should have been, the state law claims could have been dismissed on the basis of *United Mineworkers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) and then raised in state court where they properly belonged.

For all these reasons, the defendants' motion for directed verdict on the § 1983 count was properly granted.