737 F.2d 894
 Emma F. GILMERE, individually and as Administratrix of the
Estate of Thomas E. Patillo and for the benefit of
his next of kin, Plaintiff-Appellee,
Cross- Appellant,
v.
CITY OF ATLANTA, GEORGIA, et al., Defendants-Appellants,
Cross-Appellees.
Emma F. GILMERE, Plaintiff-Appellee, Cross-Appellant,
v.
CITY OF ATLANTA, et al., Defendants-Appellants, Cross-Appellees.
 Nos. 82-8457, 82-8760.
 United States Court of Appeals,
Eleventh Circuit.
 July 9, 1984.
Opinion on Granting Rehearing En Banc Oct. 1, 1984.
 
 Marva Jones Brooks, Mary Carole Cooney, Laurice Mayes Pope, George R. Ference, Atlanta, Ga., for City of Atlanta & R.C. Sampson.
 J.M. Raffauf, Decatur, Ga., for Gilmere.
 Appeals from the United States District Court for the Northern District of Georgia.
 Before TJOFLAT and HILL, Circuit Judges, and LYNNE*, District Judge.
 TJOFLAT, Circuit Judge:
 
 
 1
 This is a survival action[1] brought by the administratrix of the estate of a man injured, and killed, in a police-citizen encounter. We determine the sufficiency of the plaintiff's damages claims under 42 U.S.C. Sec. 1983 (1982),[2] and state tort law, against the City of Atlanta, three officials of the City's Police Department, and two uniformed police officers under Monell v. Department of Social Services, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); Parratt v. Taylor, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981); and Rizzo v. Goode, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976). We conclude on the basis of the district court's findings of fact and conclusions of law that the plaintiff failed to establish a 42 U.S.C. Sec. 1983 (1982) claim against any of these defendants. We also conclude that plaintiff failed to establish state law claims of false arrest or false imprisonment against any defendant. The district court's findings and conclusions on plaintiff's state law claim against the individual defendants for assault and battery are inadequate to permit us to render a decision as to their sufficiency; consequently, we remand that claim for further proceedings.
 
 I.
 
 2
 The plaintiff's claims in this case grew out of a New Year's Day celebration. We recite the salient facts as the district court found them.
 
 
 3
 Thomas Patillo, the plaintiff's decedent, spent the afternoon of January 1, 1980, driving about Atlanta with a male companion, visiting friends and drinking quite heavily.[3] He came home around 5:00 p.m. and pulled into a service station across the street from his house to buy some gas. As he was driving out of the station he almost hit a red van also leaving the station. Patillo and the driver of the van got out of their vehicles and exchanged words. Patillo pulled a handgun from his trunk and threatened the driver. The driver, in turn, ran for a telephone and called the police. Atlanta Police Officers C.C. Craig and R.C. Sampson responded to the call. By this time, Patillo had gone home and parked his car in front of his house. The two officers, accompanied by the driver of the van, walked to Patillo's front porch and knocked on the door. A friend of Patillo's answered the door, and Officer Sampson asked for the driver of the car parked out front. Patillo then came to the door, and the driver of the red van said, "That's him, he's the one."[4] Patillo's friends began to gather about, and the officers decided to question Patillo away from his house.
 
 
 4
 Officer Sampson grabbed Patillo[5] to steady him as they walked down the porch steps; Patillo was quite drunk.[6] Upon reaching the sidewalk Patillo bolted. Sampson caught him and held him by the back of the belt while Officer Craig grabbed his arm. They decided to take him to their patrol car which was parked in an adjacent parking lot. One of Patillo's friends followed the officers, shouting and excoriating them; they warned him to stand back, and he withdrew. Once again Patillo tried to escape, flailing his arms at the officers. In the struggle that ensued, the officers struck Patillo about the head a number of times with their hands.[7]
 
 
 5
 The officers eventually got Patillo to their patrol car. It was parked parallel to a Chevrolet Camaro; the fronts of both cars were against a building. When Officers Craig and Sampson and Patillo entered the space between these two cars Patillo broke away and grabbed Craig's holstered revolver. The revolver became dislodged and fell to the ground. Patillo lunged at Sampson, who, fearing that Patillo had the gun, reacted by pulling his revolver and firing two shots into Patillo's abdomen. Patillo collapsed and was declared dead thirty minutes later.
 
 
 6
 The shooting and the circumstances surrounding it were reviewed by the Internal Affairs Division and the Firearms Review Board of the Atlanta Police Department. Neither found any misconduct on the part of the officers. The Fulton County Grand Jury and the Federal Bureau of Investigation also reviewed the incident and recommended that no action be taken.
 
 
 7
 Plaintiff, as administratrix of Patillo's estate, then filed this suit against the City of Atlanta, its Mayor, Public Safety Director, and Chief of Police, and Officers Craig and Sampson. She sought to recover against these defendants, jointly and severally, the money damages her decedent, Patillo, allegedly would have been entitled to recover had he survived.[8] Her complaint set forth, in separate counts, four discrete causes of action. Count one, the claim that gave the district court subject matter jurisdiction of the case, was brought under 42 U.S.C. Sec. 1983 (1982); plaintiff alleged that the defendants, acting under color of state law, had deprived Patillo of his life[9] and liberty without due process of law, in violation of the fourteenth amendment, and had subjected him to an unreasonable seizure and cruel and unusual punishment, in violation of the fourth, eighth and fourteenth amendments.[10] The City allegedly deprived Patillo of these rights by promulgating a policy that permitted the deployment of untrained police officers and the use of excessive force in police-citizen encounters; the Mayor, Public Safety Director and Chief of Police (the supervisors) were allegedly liable because they implemented this policy in a general way. Officers Craig and Sampson deprived Patillo of his rights by beating and shooting him.
 
 
 8
 Counts two, three, and four presented pendent state law claims.[11] Count two sought money damages for assault and battery; count three for false imprisonment; count four for false arrest.
 
 
 9
 The defendants filed a joint answer to plaintiff's complaint. They denied the material allegations of the complaint and alleged, as affirmative defenses, that no count of the complaint stated a claim for relief and that they had at all times maintained a reasonable good faith belief in the legality of their actions.
 
 
 10
 The case was tried to the court. At the close of the plaintiff's case, the defendants moved for dismissal pursuant to Fed.R.Civ.P. 41(b). The court declined to render judgment until the close of all the evidence and therefore denied their motion. At the conclusion of the trial, the court asked the parties to brief the question of whether Parratt v. Taylor, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), barred plaintiff's count one section 1983 claim against any of the defendants. The parties submitted their briefs, but, inexplicably, the court did not deal with the Parratt question in its dispositive findings of fact and conclusions of law.
 
 
 11
 In its dispositive order, the district court dealt with count one first. The court denied as meritless plaintiff's fourth and eighth amendment claims.[12] It upheld, however, plaintiff's section 1983 fourteenth amendment due process claim, concluding that the City and Officers Craig and Sampson had deprived Patillo of a protected liberty interest,[13] the right to be free from the infliction of unnecessary physical force against one's person in a police-citizen encounter. The court held that one or more of these three defendants had deprived Patillo of this interest on two occasions: when he was struck about the head and when he was shot. The court concluded that Officers Craig and Sampson were the wrongdoers on the first occasion and held them liable for $1,000 in compensatory damages and $4,000 in punitive damages. The court held Sampson and the City liable for the shooting--Sampson because he performed the act, the City because it had trained him in a grossly negligent manner--and assessed $20,000 in compensatory damages against them. The court refused to assess punitive damages against either of these defendants because Sampson had acted in good faith, subjectively believing that Patillo had Craig's revolver in hand, and the City was immune from punitive damage liability under City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981). The court found no liability upon the part of the supervisors for violating any of Patillo's federal constitutional rights because plaintiff failed to prove an "affirmative link" between the supervisors' conduct and the constitutional injury, as required by Rizzo v. Goode, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976).
 
 
 12
 The district court disposed of plaintiff's state law claims summarily. The court denied her assault and battery claim on the theory that that claim was identical to, and duplicative of, her count one section 1983 due process claim. The court denied plaintiff's false imprisonment (count three) and false arrest (count four) claims because the officers had probable cause to arrest and detain Patillo. In a supplemental proceeding, the court awarded plaintiff $28,464.00 in attorney's fees pursuant to 42 U.S.C. Sec. 1988 (1982).[14]
 
 
 13
 The City and the officers appeal, contending that the plaintiff's section 1983 claim against them was insufficient as a matter of law. They ask that we render judgment in their favor. The plaintiff cross-appeals, contending that the court misapplied Rizzo v. Goode in concluding that there was no "affirmative link" between the supervisors' conduct and Patillo's constitutional injury, and that we should direct the district court, on remand, to enter liability and assess damages against the supervisors. The plaintiff also contends that the district court misapplied the law in assessing her attorney's fees and in disposing of her pendent state law claims against the supervisors and the officers.[15] She asks us to remand these issues to the district court for further consideration.[16]
 
 
 14
 For the reasons we set forth below, we conclude plaintiff failed to establish a 42 U.S.C. Sec. 1983 (1982) case (count one) against the City under the standard of Monell v. Department of Social Services; therefore, the City is entitled to judgment on count one of plaintiff's complaint. The plaintiff also failed to establish a section 1983 case against the officers or the supervisors. Her claim against the former was barred by Parratt v. Taylor, against the latter by Rizzo v. Goode. Accordingly, the district court's judgment on count one against the officers is reversed; with respect to the supervisors, the judgment in their favor is affirmed. Because of our disposition of plaintiff's section 1983 claims, she is not entitled to fees under 42 U.S.C. Sec. 1988 (1982), and the court's award thereof is set aside. Plaintiff's count two state law claim against the officers and the supervisors for assault and battery is remanded to the district court for further proceedings. We affirm the district court's denial of relief on counts three and four, the state law claims for false imprisonment and false arrest.
 
 
 15
 We discuss the issues on appeal as follows: in part II, the City's liability under 42 U.S.C. Sec. 1983 (1982); in parts III and IV, the officers' and supervisors' liability, respectively, under section 1983 and state tort law.
 
 II.
 
 16
 Monell v. Department of Social Services holds that a municipality can be sued for damages under 42 U.S.C. Sec. 1983 (1982) when "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers" or is "visited pursuant to governmental 'custom' even though such custom has not received formal approval through the body's official decision making channels." Monell, 436 U.S. at 690-91, 98 S.Ct. at 2035-36, rev'g in part Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). Thus, Monell imposes liability on municipalities for deprivations of constitutional rights visited pursuant to municipal policy, whether that policy is officially promulgated or authorized by custom. The official policy or custom "must be 'the moving force of the constitutional violation' in order to establish liability of a government body under Sec. 1983." Polk County v. Dodson, 454 U.S. 312, 102 S.Ct. 445, 454, 70 L.Ed.2d 509 (1981).[17] See Williams v. City of Valdosta, 689 F.2d 964, 969 (11th Cir.1982), citing Schneider v. City of Atlanta, 628 F.2d 915, 920 (5th Cir.1980); see also Hearn v. City of Gainesville, 688 F.2d 1328 (11th Cir.1982).
 
 
 17
 Monell limits what may constitute "custom."[18] Custom consists of those practices of city officials that are "so permanent and well settled" as to have "the force of law." Id. 436 U.S. at 691, 98 S.Ct. at 2036. In defining custom in this fashion the Monell Court borrowed language from Adickes v. S.H. Kress & Co., 398 U.S. 144, 167-68, 90 S.Ct. 1598, 1613-14, 26 L.Ed.2d 142 (1970),[19] which defines the term "custom" as "persistent and widespread ... practices" or practices that are "permanent and well settled" or "deeply embedded traditional ways of carrying out ... policy."[20] Id. Accord, Bennett v. City of Slidell, 728 F.2d 762 (5th Cir.1984) (en banc). Monell additionally teaches that the city custom which may serve as the basis for liability may only be created by city "lawmakers or those whose edicts or acts may fairly be said to represent official policy." 436 U.S. at 694, 98 S.Ct. at 2037-38.
 
 
 18
 Finally, Monell makes clear that a city may not be held liable simply because its agent causes an injury, even a constitutional injury. As the Court cautioned, a municipality may not be held liable "solely because it employs a tortfeasor--or, in other words, a municipality cannot be held liable under Sec. 1983 on a respondeat superior theory." Id. at 691, 98 S.Ct. at 2036 (emphasis in original). Accord, Owen v. City of Independence, 445 U.S. 622, 633, 100 S.Ct. 1398, 1406, 63 L.Ed.2d 673 (1980).
 
 
 19
 In this case, plaintiff did not base the City's liability on the theory that the police officers injured Patillo in the process of executing an officially promulgated "policy statement, ordinance, regulation or decision" of the City of Atlanta. 436 U.S. at 690-91, 98 S.Ct. at 2035-36. Rather, plaintiff sought to hold the City liable on the theory that the police officers injured Patillo while carrying out two alleged customs of the City, both presumably established by the supervisor defendants. The first was the custom of the Atlanta Police Department to encourage the use of excessive force in police-citizen encounters. The second was the Department's custom of selecting and training its officers improperly.[21] To prove the existence of each of these customs, the plaintiff had to establish two elements: that the custom had been created, and that it had been created or maintained[22] by one or more "lawmakers or by those whose edicts or acts may fairly be said to represent official policy." Id., at 694, 98 S.Ct. at 2037-38.
 
 
 20
 Addressing the first custom plaintiff cited, the district court concluded that the plaintiff failed to prove the first element, that a police department custom encouraging the use of excessive force actually existed. The plaintiff produced very little evidence of incidents in which Atlanta police officers had used excessive force in citizen encounters and nothing at all to indicate that any policy-setting official had approved of, much less encouraged, such conduct.
 
 
 21
 As for the second custom, the court made no effort to determine whether it even existed and, if it did, which officials, if any, had established it. Instead, the court focused on the question, irrelevant under the Monell standard, of whether the Atlanta Police Department had been negligent in training Officers Craig and Sampson. The court reviewed the Department's training programs, most of which were administered by its police academy, and found that the training currently given new officers was satisfactory.[23] Craig had received such training; the court therefore concluded that the Department, and thus the City, had not been negligent in his case. In Sampson's case, however, the court found that the Department's training of him had been so lacking as to constitute "gross negligence" or "deliberate indifference." Sampson had joined the Atlanta police force in 1973 and received the police academy training given to new officers at that time. In 1978, he resigned from the force to pursue other unrelated employment. In 1979, Sampson returned to the force.[24] At this time he was given a one-day "reorientation" program; he then assumed the normal line officer duties. It was this one-day orientation and the Department's failure to give Sampson a psychological test (then being given to new officers) that the district court found to be "gross negligence" and "deliberate indifference" on the City's part.[25] The court based the City's liability for Sampson's shooting of Patillo solely on this finding.[26] It made no findings concerning the retraining of other officers who had spent time off the force.
 
 
 22
 The district court erred in two significant respects in holding that the Department's gross negligence in training Officer Sampson would suffice to render the City liable under the Monell standard. First, as we have observed, Monell instructs that, unless the plaintiff's constitutional deprivation resulted from the execution of official policy or custom, the City cannot be held liable for money damages. Here, the evidence conclusively showed that the City had no official policy or custom to select and train its police officers improperly.[27] Second, the district court predicated the City's liability on the doctrine of respondeat superior, a doctrine Monellexplicitly eschewed. It is true that the court, in its dispositive order, did not state that the City was liable solely because of employee gross negligence, but the logic of that order renders this conclusion inescapable: one or more unnamed City employees, probably in the police department, were negligent to the point of indifference in failing to retrain Sampson, and this negligence proximately caused Patillo's injuries.
 
 
 23
 The district court cited no binding precedent from the Supreme Court, the Eleventh Circuit or the former Fifth Circuit for its holding that the gross negligence or deliberate indifference of a city agent or employee will support municipal liability for damages under section 1983, and we have found none. The court, instead, cited Leite v. City of Providence, 463 F.Supp. 585 (D.R.I.1978), as the "leading case in this area." In Leite the plaintiff brought a section 1983 claim against the City of Providence for failing to train properly its police officers, who had beaten the plaintiff. Monell had just been handed down, and the Leite court, struggling with Monell 's parameters, adopted the "deliberate indifference" standard of Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Gamble held that a section 1983 eighth amendment claim could be brought against prison officials if they showed "deliberate indifference" to the medical needs of their inmates, thus constituting cruel and unusual punishment. Id. at 104, 97 S.Ct. at 291.
 
 
 24
 Gamble is factually and legally inapposite, as it had nothing to do with municipal liability. Moreover, neither the Supreme Court nor this circuit has made the Gamble "deliberate indifference" test applicable to fourteenth amendment due process claims against municipalities. Since Gamble preceded Monell, the Supreme Court in Monell easily could have incorporated the "deliberate indifference" standard into the municipal liability calculus had it wished to do so.
 
 
 25
 The district court cited other cases besides Leite, but none fully supports its finding of liability in this case. See Edmonds v. Dillin, 485 F.Supp. 722, 727 (N.D.Ohio 1980) (" 'deliberate indifference' is not an apt standard for defining the degree of municipal culpability required under Monell "); Spriggs v. City of Chicago, 523 F.Supp. 138, 142 (N.D.Ill.1981) ("proof of culpable policy or custom must be shown"); cf. Popow v. City of Margate, 476 F.Supp. 1237, 1246 (D.N.J.1979) (single brutal incident insufficient to give rise to liability, but relying on Leite ). See also Jackson v. City of Joliet, 715 F.2d 1200 (7th Cir.1983) (rejecting gross negligence theory).
 
 
 26
 The legal prerequisite in this circuit for a finding of municipal liability under section 1983 remains that stated by the Supreme Court in Monell and by this court in Hearn v. City of Gainesville, 688 F.2d 1328 (11th Cir.1982), and Williams v. City of Valdosta, 689 F.2d 964 (5th Cir.1980). "Gross negligence" or "deliberate indifference" is simply not the proper test for adjudging a due process section 1983 claim against a municipality.[28]
 
 
 27
 In summary, the plaintiff in this case presented, at best, an isolated incident in which the police officers used excessive force to restrain an arrestee. The plaintiff did not present an incident that was the product of a City or police department custom to use excessive force. As the new Fifth Circuit recently observed, such "[i]solated violations are not the persistent, often repeated, constant violations that constitute custom and policy. Occasional acts of untrained policemen [standing alone] are not attribut[able] to city policy or custom." Bennett, 728 F.2d 762, 768 at n. 3. Accord Berry v. McLemore, 670 F.2d 30, 32 (5th Cir.1982) (single improper arrest not custom); McClelland v. Facteau, 610 F.2d 693 (10th Cir.1979); see also Turpin v. Mailet, 619 F.2d 196, 202 (2d Cir.), cert. denied sub nom. Turpin v. City of West Haven, 449 U.S. 1016, 101 S.Ct. 577, 66 L.Ed.2d 475 (1980) (failure to discipline officer for single incident of illegality was not official policy). Patillo's injury at the hands of Officers Craig and Sampson was not caused by their execution of official municipal policy or of custom. Accordingly, the judgment against the City of Atlanta must be reversed.
 
 III.
 A.
 
 28
 Plaintiff claimed that Officers Craig and Sampson denied Patillo three federal constitutional rights: the fourth amendment right to be free from unreasonable seizure, the eighth amendment right to be free from cruel and unusual punishment, and the fourteenth amendment right to due process of law. It is clear, as the district court found, that the officers had probable cause to arrest Patillo, or at least to make a brief forcible investigative detention under Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), once the driver of the red van said, "That's him, he's the one." Thus, Patillo was not seized in violation of the fourth amendment. Plaintiff's eighth amendment claim was equally unavailing. The proscription against cruel and unusual punishment applies only after a criminal conviction. See United States v. Lovett, 328 U.S. 303, 317-18, 66 S.Ct. 1073, 1079-80, 90 L.Ed. 1252 (1946); Bell v. Wolfish, 441 U.S. 520, 535 n. 16, 99 S.Ct. 1861, 1872 n. 16, 60 L.Ed.2d 447 (1979). Since Patillo did not occupy a convict status, he could not have had an eighth amendment claim.
 
 
 29
 The due process clause of the fourteenth amendment states, "[N]or shall any State deprive any person of life, liberty, or property, without due process of Law...." U.S. Const. amend. XIV Sec. 1. Plaintiff made no claim that the officers deprived Patillo of his life or property without due process of law;[29] rather, she claimed that the officers deprived Patillo of a protected liberty interest, one's interest in being free from the government's use of unnecessary physical force against his person.
 
 
 30
 There is no dispute that the plaintiff's proof satisfied three prerequisites of a valid fourteenth amendment due process claim: the officers acted under color of state law; they infringed a protected liberty interest; and the injuries Patillo suffered amounted to a deprivation. "Standing alone, however, these three elements do not establish a violation of the Fourteenth Amendment. Nothing in that Amendment protects against all deprivations of life, liberty, or property by the State. The Fourteenth Amendment protects only against deprivations 'without due process of law.' " Parratt v. Taylor, 451 U.S. 527, 537, 101 S.Ct. 1908, 1913-14, 68 L.Ed.2d 420 (1981), citing Baker v. McCollan, 443 U.S. 137, 145, 99 S.Ct. 2689, 2695, 61 L.Ed.2d 433 (1979). Our inquiry "therefore must focus on whether [the plaintiff's decedent] suffered a deprivation of [liberty] without due process of law." Specifically, we must decide "whether the tort remedies which the State of [Georgia] provides as a means of redress for [liberty] deprivations satisfy the requirements of procedural due process." Id.
 
 
 31
 At the time of Patillo's deprivation, and, as well, at the time his administratrix instituted this action, Georgia provided tort remedies precisely for the sort of injuries Patillo sustained at the hands of the officers here. See, e.g., Stewart v. Williams, 243 Ga. 580, 255 S.E.2d 699 (Ga.1979) (discussing state torts of intentional and negligent false imprisonment); Ga.Code Ann. Sec. 105-601, 602 (1968 & 1981 Supp.) (battery); Thomas v. Williams, 105 Ga.App. 321, 124 S.E.2d 409 (1962) (police officer negligently permitting battery). The narrow question we must decide is whether these post-deprivation remedies satisfied the due process clause of the fourteenth amendment.
 
 
 32
 The Supreme Court has made it plain that a post-deprivation remedy will not suffice if "the deprivation ... was pursuant to some established state procedure and 'process' could be offered before any actual deprivation took place." Parratt, 451 U.S. at 537, 101 S.Ct. at 1914. See, e.g., Mullane v. Central Hanover Bank & Trust, 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950) (prior notice and opportunity to be heard required before trust account can be closed); Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972) (Florida prejudgment ex parte replevin violated due process clause); Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) (prior notice and hearing required before state cut off welfare benefits). In each of these cases, the deprivation was authorized by an established state procedure and due process was held to require predeprivation notice and hearing in order to serve as a check on the possibility that wrongful deprivation would occur. See also Parratt, 451 U.S. at 537-38, 101 S.Ct. at 1914 (citing cases).
 
 
 33
 The Supreme Court has held, however, that a post-deprivation remedy can satisfy due process when quick action by the government is necessary or the provision of predeprivation process is impracticable, if the post-deprivation remedy is afforded "at a meaningful time and in a meaningful manner." Id. at 540, 101 S.Ct. at 1915, citing Armstrong v. Manzo, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965). See, e.g., North American Cold Storage Co. v. Chicago, 211 U.S. 306, 29 S.Ct. 101, 53 L.Ed. 195 (1908) (prenotice destruction of tainted food; post-deprivation remedy satisfied due process); Mitchell v. W.T. Grant Co., 416 U.S. 600, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974) (prehearing replevin permissible given adequate post-seizure remedy); Ewing v. Mytinger & Casselberry, Inc., 339 U.S. 594, 70 S.Ct. 870, 94 L.Ed. 1088 (1950) (summary seizure and destruction of misbranded drugs does not violate due process).
 
 
 34
 In Parratt, the Supreme Court held that an adequate post-deprivation remedy will suffice if the deprivation is caused by a random and unauthorized state act for which prior process is impracticable or impossible.[30] In Patillo's case the conduct of the officers, the excessive use of force, was, as the district court found, plainly unauthorized. The conduct was also random; neither the City nor the officers could have predicted precisely when it could occur. Indeed, Patillo's deprivation, although under color of state law, was beyond the control of the government. In sum, "it [was] not only impracticable, but impossible, to provide a meaningful hearing before the deprivation." 451 U.S. at 541, 101 S.Ct. at 1916. Given that Georgia provided Patillo an adequate post-deprivation remedy (albeit in the form of a survival action), Patillo received all the process he was due under the fourteenth amendment.[31]
 
 
 35
 Plaintiff contends that the Supreme Court's rationale in Parratt does not apply in cases involving the intentional deprivation of liberty interests. She urges us to follow the teachings of commentators and other lower courts that would limit the Parratt rationale to negligent deprivations of property.[32] The logic behind Parratt and its predecessors[33] cannot be so constricted.
 
 
 36
 Logically, if the post deprivation remedy cures the negligent deprivation, it should cure the intentional deprivation. If due process can be satisfied afterwards in the case of negligence, due process can be satisfied afterwards in the case of intentional taking.... [T]he Court is inclined to treat a negligent taking and an intentional taking the same way.... To the extent that the question is one for legal analysis, the path of least resistance is to say that because an adequate state remedy bars a Sec. 1983 action for deprivation of property it also bars such a remedy for deprivation of liberty.
 
 
 37
 K. Davis, Administrative Law Treatise Sec. 26.14 at 434-35 (1982 Supp.); accord, Smolla, The Displacement of Federal Due Process Claims by State Tort Remedies: Parratt v. Taylor and Logan v. Zimmerman Brush Company, 1982 U.Ill.L.Rev. 831, 833 (Parratt offers a "unified theory for handling the relationship between state tort law and federal section 1983 claims.") Contra, Kirby, Demoting 14th Amendment Claims to State Torts, 68 A.B.A. J. 166, 167 (1982) (Parratt is "sweeping curtailment of federal civil rights litigation"); Note, A Theory of Negligence for Constitutional Torts, 92 Yale L.J. 683, 691-95 (1983).
 
 
 38
 Several courts have adopted the view that the Parratt rationale must apply to reckless and intentional deprivations of both liberty and property. See Palmer v. Hudson, 697 F.2d 1220, 1222-23 (4th Cir.1983) (intentional property destruction); Engblom v. Carey, 677 F.2d 957, 964-66 (2d Cir.1982); Ellis v. Hamilton, 669 F.2d 510, 514-16 (7th Cir.1982), cert. denied, 459 U.S. 1069, 103 S.Ct. 488, 74 L.Ed.2d 631 (1983); Rutledge v. Arizona Board of Regents, 660 F.2d 1345, 1352 (9th Cir.1981) aff'd on other grounds sub nom. Kush v. Rutledge, 460 U.S. 719, 103 S.Ct. 1483, 75 L.Ed.2d 413 (1983) (assault and battery by state college football coach);[34] Spriggs v. City of Chicago, 523 F.Supp. 138, 143 n. 5 (N.D.Ill.1981) (plaintiff beaten by police); Barnier v. Szentmiklosi, 565 F.Supp. 869 (E.D.Mich.1983) (plaintiff beaten by police) (citing cases).
 
 
 39
 To support her argument that Parratt must be restricted to its facts, plaintiff cites Justice Blackmun's concurring opinion in Parratt in which he stated that the majority's rationale applied only to negligent deprivations of property. Justice Blackmun gave no reason for treating "liberty" different from "property" under the fourteenth amendment,[35] and such a distinction is contrary to Ingraham v. Wright,[36] 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977), in which the Court held that post-deprivation common law remedies provided all the process due a school child whose liberty has been deprived by (intentional) paddling by school authorities. The Parratt majority said that its analysis was "quite consistent" with the analysis it adopted in Ingraham. 451 U.S. at 542, 101 S.Ct. at 1916. We think a proper reading of Parratt and its predecessors, and the better reasoned lower court cases and scholarly articles, support the application of Parratt 's rationale to cases involving intentional deprivations of liberty.[37] But cf. text at 910. The due process claim in Ingraham failed even though the plaintiff proved an intentional deprivation of liberty.[38] See also Smolla, supra at 874 n. 185. Moreover, Parratt itself held that the defendant's state of mind is irrelevant in assessing whether the plaintiff has a cause of action under section 1983, 451 U.S. at 534, 101 S.Ct. at 1912. Whether a deprivation is sudden and intentional or merely negligent, the state cannot practically provide pre-deprivation process.[39] Finally, we find nothing in the debates that surrounded the adoption of the fourteenth amendment that indicates that the framers intended that liberty and property interests receive different treatment.
 
 
 40
 Having denied plaintiff's constitutional claim against the officers, we must add a caveat. Section 1983 creates no substantive rights. Chapman v. Houston Welfare Rights Organization, 441 U.S. 600, 617, 99 S.Ct. 1905, 1916, 60 L.Ed.2d 508 (1979). Plaintiff filed suit in federal court under 42 U.S.C. Sec. 1983 (1982) seeking a review under the U.S. Constitution of the deprivation of Patillo's liberty. Except for matters the district court dismissed as frivolous, the plaintiff did not allege any violation of substantive guarantees of the federal Constitution. Like the plaintiff in Parratt, the plaintiff here "refer[red] to no other right, privilege, or immunity secured by the Constitution or federal laws other than the Due Process Clause of the Fourteenth Amendment simpliciter." Parratt, 451 U.S. at 536, 101 S.Ct. at 1913. See Williams v. Kelley, 624 F.2d 695, 697 (5th Cir.1980) (death-causing chokehold by police stated no section 1983 claim; "federal [civil] rights protection [is] far less extensive than that afforded by the common law of battery and negligence"). Thus our holding today is in line with Duncan v. Poythress, 657 F.2d 691, 704 (5th Cir. Unit B 1981), where the plaintiff's claim was held to be not barred by Parratt because it was based on the substantive due process right to vote. See Wells & Eaton, Substantive Due Process and the Scope of Constitutional Torts, 18 Ga.L.Rev. 201 (1984). Additionally, the acts of the police here, although most unfortunate, did not "offend those canons of decency and fairness which express the notions of English-speaking peoples even toward those charged with the most heinous offense" or "shock the conscience,"[40] so as to violate the substantive due process guarantees "implicit in the concept of ordered liberty." Palko v. Connecticut, 302 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937).
 
 B.
 
 41
 The district court denied plaintiff's pendent state law claims against the officers for false imprisonment and false arrest because they were frivolous. We affirm this holding. The court held that the pendent assault and battery claim (count two) had merit, but denied the claim because it would result in damages duplicative of those awarded for the fourteenth amendment due process violation (count one). This was error; the facts the court found concerning the beating and shooting supported state tort liability. Assuming that the elements of compensatory and punitive damages under the section 1983 and assault and battery claims were the same, the court should have given the plaintiff one money judgment, based on both claims. The parties have not briefed this damages issue, however; therefore, we remand it to the district court for further exploration.IV.
 
 
 42
 Plaintiff's count one 42 U.S.C. Sec. 1983 (1982) claim against the supervisors is subject to the same Parratt analysis we applied to her claim against the police officers; we look to Georgia law to determine what post-deprivation tort remedies were available to the plaintiff and whether those remedies were adequate. Our canvas of the Georgia statutory and case law leaves us in considerable doubt as to whether the plaintiff had adequate remedies against the supervisors for the injury Patillo sustained. Compare Massey v. Perkerson, 129 Ga.App. 895, 201 S.E.2d 830 (1973) (police chief not liable for tort of subordinate unless he was present, ordered, or supervised the conduct) with Ga.Code Ann. Sec. 24-2812 (1981) (sheriff liable for tortious conduct of deputies in the line of duty). We need not resolve this doubt, however, because another issue is dispositive of the plaintiff's claim.
 
 
 43
 The district court denied the plaintiff's due process claim against the supervisors because there was no "affirmative link" between their alleged negligence and the deprivation of Patillo's liberty. Rizzo v. Goode, 423 U.S. 362, 371, 96 S.Ct. 598, 604, 46 L.Ed.2d 561 (1976), teaches that to prevail against persons in a supervisory role the plaintiff must demonstrate an "affirmative link" between his deprivation and "the adoption of [a] plan or policy by [the supervisors]--express or otherwise--showing their authorization or approval of such misconduct."[41] Id. A "mere right to control" is not enough. Monell, 436 U.S. at 694 n. 58, 98 S.Ct. at 2037 n. 58, citing Rizzo, 423 U.S. at 370-71, 96 S.Ct. at 602. The district court found no such link; its findings of fact on this issue are not clearly erroneous, Fed.R.Civ.P. 52(a), and its conclusions of law were correct. The court's judgment in favor of the supervisors on count one must, accordingly, be sustained.
 
 
 44
 With respect to the plaintiff's pendent state law claims against the supervisors, which the district court summarily rejected, it is clear from the record that the plaintiff cannot prevail on her claims of false imprisonment (count three) and false arrest (count four). We cannot determine, however, from the court's dispositive findings and conclusions the basis for such rejection of plaintiff's assault and battery claim against the supervisors (count two) and thus cannot review the sufficiency of that claim. We therefore vacate the court's judgment in favor of the supervisors on count two and remand it for further findings of fact and conclusions of law.
 
 V.
 
 45
 In conclusion, as to the City of Atlanta, we REVERSE the district court's judgment on count one and direct the court, on receipt of the mandate, to enter judgment for the City.*
 
 
 46
 As to Officers Craig and Sampson, we REVERSE the district court's judgment on count one and direct the court, on receipt of the mandate, to enter judgment in the officers' favor; we VACATE the court's judgment on count two and REMAND the case as to that count, directing the court to hold the officers liable to the plaintiff, in accordance with the court's previous findings of fact and conclusions of law, and to assess plaintiff's damages against them in accordance with Georgia law; we AFFIRM the court's judgment on counts three and four.
 
 
 47
 As to the supervisors, the Mayor, Public Safety Director and Chief of Police, we AFFIRM the court's judgment on counts one, three, and four; we VACATE the court's judgment on count two and REMAND the case as to that count for the entry of findings of fact and conclusions of law.
 
 
 48
 We REVERSE the district court as to the issue of attorneys' fees under 42 U.S.C. Sec. 1988 (1982) against the City of Atlanta and Officers Craig and Sampson.
 
 
 49
 We REVERSE the judgment of costs against the City of Atlanta; we VACATE the judgment of costs against Officers Craig and Sampson, without prejudice to plaintiff's right to seek the taxation of costs at the conclusion of this litigation.ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC
 
 
 50
 Before GODBOLD, Chief Judge, RONEY, TJOFLAT, HILL, FAY, VANCE, KRAVITCH, JOHNSON, HENDERSON, HATCHETT, ANDERSON and CLARK, Circuit Judges.
 
 BY THE COURT:
 
 51
 A member of this court in active service having requested a poll on the application for rehearing en banc and a majority of the judges in this court in active service having voted in favor of granting a rehearing en banc.
 
 
 52
 IT IS ORDERED that the cause shall be reheard by this court en banc with oral argument on a date hereafter to be fixed. The clerk will specify a briefing schedule for the filing of en banc briefs.
 
 
 
 *
 Honorable Seybourn H. Lynne, U.S. District Judge for the Northern District of Alabama, sitting by designation
 
 
 [1]
 See infra note 8
 
 
 [2]
 Section 1983 was originally enacted as part of the Civil Rights Act of 1871, "An Act to enforce the Provisions of the Fourteenth Amendment to the Constitution of the United States and for other Purposes," 17 Stat. 13 (1871), sometimes referred to as "the Ku Klux Klan Act," or the "Third Civil Rights Act." The current wording, essentially the same as the original, reads:
 Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.
 
 
 [3]
 At the time of his death Patillo's blood alcohol content was .27 milligrams percent. A .10 milligrams percent level created a presumption of intoxication under Georgia law. O.C.Ga. Sec. 40-6-392(b)(3) (1981)
 
 
 [4]
 The driver of the red van disappeared in the ensuing confusion and was never located by police
 
 
 [5]
 Patillo was a 38-year old black male approximately 5'9"' tall, weighing 130 pounds. R.C. Sampson is a black male, approximately 5'9"" tall, and weighed 150 pounds. C.C. Craig is a white male, approximately 5'8"', and weighed about 250 pounds
 
 
 [6]
 See supra note 3
 
 
 [7]
 They either struck him with their open palms or employed moderate force using their fists. There were no marks of any type upon Patillo's scalp, which was bald, face, or neck, however
 
 
 [8]
 In Brazier v. Cherry, 293 F.2d 401 (5th Cir.), cert. denied, 368 U.S. 921, 82 S.Ct. 243, 7 L.Ed.2d 136 (1961), the Fifth Circuit acknowledged that the federal civil rights laws do not speak to survivorship of actions and the courts must, therefore, look to the laws of the states in which they sit to determine if provision is made for the survivorship of a given cause of action. It is undisputed that in Georgia the decedent's claim for damages sustained during his lifetime survives:
 No action for a tort shall abate by the death of either party, where the wrongdoer received any benefit from the tort complained of; nor shall any action, or cause of action, for the recovery of damages for homicide, injury to the person, or injury to property abate by the death of either party. The cause of action, in case of the death of the plaintiff and in the event there is no right of survivorship in any other person, shall survive to the personal representative of the deceased plaintiff ....
 Ga.Code Ann. Sec. 3-505 (1978).
 Section 3-505 allows for the survivorship of tort actions. It is distinct from, and should not be confused with, the Georgia wrongful death statute, which at the time of this suit was codified at Ga.Code Ann. Sec. 105-1301 (1978). The Georgia wrongful death statute creates a new cause of action in certain individuals for the value of the decedent's life. We deal here solely with section 3-505, which permits survival of the tort claims which the deceased possessed the instant before he died. Accord Brazier v. Cherry, 293 F.2d 401 (5th Cir.1961); Anderson v. Jones, 508 F.Supp. 399 (N.D.Ga.1980).
 As the Georgia Supreme Court put it, section 3-505 provided "for the survival to the administrator of causes of action that exist in the deceased person before his death." Complete Auto Transit, Inc. v. Floyd, 214 Ga. 232, 238, 104 S.E.2d 208, 213 (Ga.1958) (husband's suit under wrongful death statute for death of wife not part of the same cause of action as his suit as administrator under Sec. 3-505 for wife's pain and suffering and medical and funeral expenses). See also Wrongful Death Actions in Georgia, 19 Ga.B.J. 277 (1957).
 The district court, here, treated plaintiff's claim as having been brought under the Georgia survival statute and entered judgment for her on that theory. Thereafter, plaintiff objected in a motion to alter or amend judgment, claiming that her complaint also stated a claim for wrongful death. The district court found otherwise in a lengthy written order which we find persuasive and affirm.
 Since the trial in this case Ga.Code Ann. Sec. 3-505 (1978) has been recodified in its entirety as O.C.Ga. Sec. 9-2-41 (1982).
 
 
 [9]
 Notwithstanding this allegation, the district court correctly construed plaintiff's complaint as not claiming damages for the deprivation of Patillo's life but only for the deprivation of his liberty. See supra note 8. In this opinion, therefore, our discussion is limited to the defendants' alleged deprivation of Patillo's liberty interest
 
 
 [10]
 The fourth amendment prohibition of unreasonable seizure was made applicable to the states under the fourteenth amendment in Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). The eighth amendment prohibition on cruel and unusual punishment was incorporated into the fourteenth amendment by Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). For ease of analysis, hereafter we refer to these guarantees simply as fourth and eighth amendment rights
 
 
 [11]
 Count four, the claim for false arrest, was added by amendment to the complaint
 
 
 [12]
 See supra note 10. The fourth amendment claim fell because, as the district court noted in discussing the state law false arrest and false imprisonment issues, the officers had probable cause to arrest Patillo under O.C.Ga. Sec. 51-7-3, formerly Ga.Code Ann. Sec. 105-1003 (1981); see infra text at 910. The eighth amendment claim was without merit. Ingraham v. Wright, 430 U.S. 651, 659-71, 97 S.Ct. 1401, 1406-12, 51 L.Ed.2d 711 (1977)
 
 
 [13]
 "Liberty" and "property" interests protected by the fourteenth amendment are usually defined by state law. See, e.g., Bell v. Burson, 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971); Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972); see generally Nahmoud, Section 1983 and the "Background of Tort Liability", 50 Ind.L.J. 5 (1974). It is beyond peradventure that Georgia law protects individuals from bodily invasions such as assault and battery. See, e.g., infra text at 905. In Meyer v. Nebraska, 262 U.S. 390, 399, 43 S.Ct. 625, 626, 67 L.Ed. 1042 (1923), the Supreme Court defined "liberty" to include freedom from bodily restraint. See generally J. Nowak, R. Rotunda & J. Young, Constitutional Law 416-22 (2d ed. 1983); Smolla, The Displacement of Federal Due Process Claims by State Tort Remedies: Parratt v. Taylor and Logan v. Zimmerman Brush Company, 1982 U.Ill.L.Rev. 831
 
 
 [14]
 The court also awarded the plaintiff $8,606.40 in costs. Our disposition of this appeal requires us to set aside that award as against the City. Because the district court, on remand, will enter judgment against the officers on count two and, if they are found liable, the supervisors, the court will have to redetermine the costs the plaintiff should recover
 
 
 [15]
 We do not read plaintiff's notice of appeal and briefing to us as requesting review of the district court's holding that the City was not liable on the state law claims
 
 
 [16]
 Plaintiff also contends on cross-appeal that her complaint stated a claim for a wrongful-death type recovery. Her contention is meritless. See supra notes 8 and 9 and accompanying text
 
 
 [17]
 Cf. Rizzo v. Goode, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561, (1976) (general allegations of administrative negligence fails to state a constitutional claim cognizable under Sec. 1983)
 
 
 [18]
 See Schneider v. City of Atlanta, 628 F.2d 915, 920 (5th Cir.1980); Williams v. City of Valdosta, 689 F.2d 964, 969 (11th Cir.1982)
 
 
 [19]
 For a thorough description of this area, see Bennett v. City of Slidell, 728 F.2d 762 (5th Cir.1984) (en banc)
 
 
 [20]
 In Adickes a white plaintiff sought damages under Sec. 1983 when she was denied a seat at a lunch counter because she was in the company of blacks. The Adickes Court held that the plaintiff stated a claim under Sec. 1983 because service was refused under color of state law: there was a state enforced custom of segregation. 398 U.S. at 173-74, 90 S.Ct. at 1617
 
 
 [21]
 Plaintiff particularly alleged that the City's custom included a failure to require officers to carry nightsticks. Presumably, Officer Sampson would not have shot Patillo had he been carrying a nightstick
 
 
 [22]
 It is not necessary that the "law makers or those whose edicts or acts may fairly be said to represent official policy" actually initiate the custom in order to create it. Custom may result when such law makers or officials maintain, by implicit ratification, a policy begun by persons whose edicts or acts could not be said to represent official policy
 
 
 [23]
 The district court found that the training given new officers included psychological testing and thirteen weeks' police academy instruction
 
 
 [24]
 Sampson had been a police officer from 1973-1978. He quit the force as an officer in good standing in 1978 to pursue another career but was rehired in 1979. When he came on the force in 1973 he completed the then-standard six-week academy training. He received no psychological testing. When Officer Craig was hired, some time later, he received 13 weeks' academy training and was tested psychologically. During Sampson's five years as an officer, from 1973-1978, two citizen complaints were filed against Sampson; he was cleared on each occasion. The two performance evaluations introduced into evidence showed that Sampson scored average and above average marks, although one of the evaluations suggested that he could "mature" and "curb his temper." There was also evidence concerning Sampson's many speeding tickets and pilfering from work before becoming an officer and his casual marijuana use while on the force
 Sampson's employment record also contained high praise for him as an officer. One month his zone commander nominated him for officer of the month due to his "determination and dedication to his duty" in clearing 30 robberies in Southwest Atlanta. He received a written commendation for a "job well done" from his lieutenant for apprehending a band of violent purse snatchers who preyed on elderly women. This arrest closed 23 cases. Before he was rehired, Sampson's former immediate supervisors were requested to comment upon his work as an officer from 1973-1978. A sergeant who supervised Sampson on morning watch described him as "one of the best officers [I] have ever known ... a very conscientious worker, very reliable and cleared as many burglaries as the rest of the watch combined." A second lieutenant described Sampson as "very knowledgeable, conscientious and a very good worker ... we need more officers like Sampson and [I] would like to see him back." After he was rehired, the Chief of Police wrote Sampson, in 1979, to convey thanks from two citizens, who "were highly complimentary, citing your kindness and efficiency" in a suicide case. In a November 1978 polygraph test, taken when he was seeking readmission to the police force, Sampson admitted to infrequent use of marijuana, the most recent episode being 10 months before. The polygraph report stated that "no deception" was indicated.
 
 
 [25]
 The district court did not explain how failure to test Sampson psychologically caused Patillo's injury
 
 
 [26]
 Ironically, the district court found that the supervisors, the Mayor, the Public Safety Director, and the Chief of Police, were not responsible for the poor refresher training given Sampson. The district court hypothesized that the plaintiff may simply have named the wrong supervisors as parties defendant and as those responsible for city policy under the Monell standard. According to the court, Patillo's beating was caused by Craig and Sampson's vexation at Patillo, not Sampson's poor training. Thus, the court held the City liable only for the shooting
 
 
 [27]
 That Officer Sampson may have been ignorant of a number of police procedures did not establish that the City had an official policy or custom of putting untrained officers on the streets. See text infra
 
 
 [28]
 We see no need to remand to the district court for a finding on the question of whether the Atlanta Police Department had a custom of improper selection or training of officers. The record makes it clear that there was simply no such custom under the Monell standard
 
 
 [29]
 See supra notes 8 and 16
 
 
 [30]
 The Parratt holding did not come as a total surprise. The Supreme Court had been developing the Parratt analysis for a number of years prior to Parratt. See cases cited supra text at 905 - 906 and accompanying notes. In Paul v. Davis, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), the Chief of Police of Louisville, Kentucky, had circulated Davis' picture to local merchants on a flyer purporting to identify "ACTIVE SHOPLIFTERS." Davis was, in fact, not a shoplifter. Rather than suing for defamation in state court, Davis brought a 1983 action, alleging that his liberty and property were denied under color of state law without due process. Justice Rehnquist, writing for the Court, noted that the complaint was "nothing more than a claim for defamation under state law" and the due process clause did not "ex proprio vigore extend to him a right to be free of injury wherever the State may be characterized as the tortfeasor." 424 U.S. at 698, 701, 96 S.Ct. at 1159-60. To hold otherwise would
 make of the Fourteenth Amendment a font of tort law to be superimposed upon whatever systems may already be administered by the States. We have noted the "constitutional shoals" that confront any attempt to derive from congressional civil rights statutes a body of general federal tort law....
 Id., citing Griffin v. Breckenridge, 403 U.S. 88, 101-02, 91 S.Ct. 1790, 1797-98, 29 L.Ed.2d 338 (1971). The Court then went on to hold that Davis had stated no claim under section 1983 because reputation, alone, is not broad enough to constitute a liberty or property interest. For an excellent analysis of Paul, see Smolla supra note 13, at 836-40.
 In the next case, Ingraham v. Wright, 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977), aff'g 525 F.2d 909 (5th Cir.1976), a case from the former Fifth Circuit, the Supreme Court encountered a section 1983 class action brought on behalf of school children, who alleged that their liberty was curtailed without due process when their public school teachers paddled them for disciplinary reasons without affording them a prior hearing. The Court agreed that the children had a constitutionally protected liberty interest in bodily security but, just as in Paul, the Court noted that a time-tested and fully effective remedy for the injury existed in state law: the tort of assault and battery. The Court held that because a predeprivation hearing before every school paddling was impractical, the state remedies provided the only "process" which was due. The Court relied on the openness of our schools and the historically low incidence of paddling abuse by teachers to conclude that "the Fourteenth Amendment's requirement of procedural due process is satisfied by Florida's preservation of common law constraints and remedies." 430 U.S. at 676, 97 S.Ct. at 1419. Ingraham thus stands for the proposition that when a predeprivation process is impracticable a state may, at least in some situations, still intentionally deprive a person of liberty so long as the state provides adequate and effective post-deprivation remedies, usually in the form of a tort action. Because of the undesirability or impracticality of affording pre-deprivation process, full process is available after the deprivation and the procedural protections of the due process clause of the fourteenth amendment are not impaired. The Ingraham analysis is consistent with prior Supreme Court cases where pre-deprivation hearings were impractical or impossible. See cases cited supra text at 905 - 906; see also Fahey v. Mallonee, 332 U.S. 245, 67 S.Ct. 1552, 91 L.Ed. 2030 (1947); (bank failing); Mathews v. Eldridge, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) (termination of Social Security benefits).
 The Supreme Court encountered a third section 1983 deprivation of liberty case in Baker v. McCollan, 443 U.S. 137, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979), rev'g McCollan v. Tate, 575 F.2d 509, 511 (5th Cir.1978). In that case the plaintiff was arrested on a facially valid warrant which was intended for his brother. The mistake was caused because the brother had used the plaintiff's driver's license which was altered so that it sported the brother's photograph. The plaintiff protested his innocence for eight days and was released when the sheriff finally discovered that he had the wrong man. In addressing this case the former Fifth Circuit relied totally upon tort law principles, in effect reading the false imprisonment portion of the Second Restatement of Torts into the fourteenth amendment. See 575 F.2d at 512-13. The Supreme Court, again through Justice Rehnquist, reversed; the High Court held that plaintiff may have made out a prima facie case for the state tort of false imprisonment, but that claim did not rise to a fourteenth amendment claim just because the defendant was a state official. The Court stated, "[s]ection 1983 imposes liability for violations of rights protected by the Constitution, not for violations of duties of care arising out of tort law. Remedy for the latter type of injury must be sought in state court under traditional tort-law principles." 443 U.S. at 146, 99 S.Ct. 2696-97.
 The Court then surveyed the sheriff's procedures for verifying the identity of his prisoners. Although the procedures did not totally eliminate the chance of error, they were found adequate and the warrant was facially valid; thus, plaintiff had not been deprived of due process. The Court made clear that it was aware of existing remedies in state court although this was not a main basis for the holding. One perceptive commentator has noted that in McCollan:
 The only place that adequate due process could have existed ... was after-the-fact, in the form of money damages. No pre-deprivation due process could possibly have been provided, since the state officials thought that they had their man. The state officials, because of the warrant, thought that pre-deprivation process had taken place.... In such a situation the only relief that can be afforded ... is money damages, and ... state tort remedies alone ought to be sufficient.
 Smolla, supra note 13, at 853 (emphasis in original).
 The Parratt holding was also foreshadowed by Bonner v. Coughlin, 517 F.2d 1311 (7th Cir.1975) modified en banc, 545 F.2d 565 (1976), cert. denied 435 U.S. 932, 98 S.Ct. 1507, 55 L.Ed.2d 529 (1978), a case written by Justice Stevens when he sat on the Seventh Circuit. There, a prisoner claimed in a section 1983 due process suit that his jailers negligently caused the loss of his property. The Bonner court, 517 F.2d at 1319, dismissed the claim, holding:
 [T]here is an important difference between a challenge to an established state procedure as lacking in due process and a property damage claim arising out of the misconduct of state officers.... For in [the latter case] ... the law of Illinois provides, in substance, that the plaintiff is entitled to be made whole for any loss of property occasioned by the unauthorized conduct of the prison guards.... [T]he existence of an adequate state remedy to redress property damage inflicted by state officers avoids the conclusion that there has been any constitutional deprivation of property without due process of law....
 The Parratt Court cited Bonner as the "proper manner" in which to approach the plaintiff's due process claim. The Court also noted that Bonner was "quite consistent" with the approach taken in Ingraham even though Ingraham involved intentional invasions of a liberty interest rather than negligent loss of property. 451 U.S. at 542-43, 101 S.Ct. 1916. The Parratt Court added emphasis to a quote from Ingraham showing that the key to Ingraham --like Bonner --was "the common law safeguards that already exist." Id. at 543, 101 S.Ct. at 1917 (emphasis in original).
 
 
 [31]
 See supra text at 905. The due process clause did not "ex proprio vigore extend to [Patillo] a right to be free of injury wherever the State may be characterized as the tortfeasor." Paul, 424 U.S. at 698, 701, 96 S.Ct. at 1160. Accord Williams v. Kelley, 624 F.2d 695 at 697-98
 
 
 [32]
 See Tarkowski v. Hoogasian, 532 F.Supp. 791, 795 (N.D.Ill.1982); Scott v. Donovan, 539 F.Supp. 255, 258 (N.D.Ga.1982); Howse v. DeBerry Correctional Inst., 537 F.Supp. 1177, 1178 (M.D.Tenn.1982). See also Parratt, 451 U.S. at 545-46, 101 S.Ct. at 1918 (Blackmun, J., joined by White, J., concurring) (Parratt limited to negligent property deprivations). See also infra text at 908
 
 
 [33]
 See supra note 30, and cases cited supra text at 905 - 907
 
 
 [34]
 The Ninth Circuit addressed this issue in Rutledge, 660 F.2d at 1345, a case where a football player for Arizona State University brought a due process section 1983 action against a coach when the coach assaulted him. Assuming that the coach deprived the player of constitutionally protected liberty, the court held that the deprivation was not without due process as defined by Parratt. The liberty denial was random, could not have been accompanied by predeprivation process, and post-deprivation state remedies were sufficient. 660 F.2d at 1352. Accordingly, Parratt, as applied to the facts of Rutledge, impelled the conclusion "that the alleged deprivation was not without due process of law." Id. Wakinekona v. Olim, 664 F.2d 708 (9th Cir.1981) (as amended on denial of reh'g and reh'g en banc) (attack on state regulations governing interstate transfer of prisoners), rev'd, 461 U.S. 238, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983), can be read as constraining a wide application of Rutledge and Parratt. Olim has been subjected to some very telling criticism in this regard. See Smolla, supra note 14, at 863-65. The Parratt issue was actually a minor one in Olim, and Olim is best read as a case similar to Logan, infra note 39, involving a deprivation pursuant to an established state procedure. The Supreme Court did not discuss the Parratt issue in reversing Olim. Accord, Barnier, 565 F.Supp. at 880-81. Cf. Frost v. City and County of Honolulu, 584 F.Supp. 356 (D.C.Hawaii, 1984) (limiting Parratt )
 
 
 [35]
 Justice Rehnquist wrote the opinion and was joined without comment by the Chief Justice and Justices Brennan and Stevens. Justice Powell concurred only in the result, because to him mere negligence could not cause a constitutional deprivation. Justice Stewart concurred briefly, stating that the injury was not of constitutional proportions. Justice Marshall concurred in part and dissented in part; he viewed the state remedy as inadequate. It is apparent that only Justices Blackmun and White would limit Parratt to negligent deprivations of property
 
 
 [36]
 See supra note 30. One reason given for subjecting property interests but not liberty interests to the Parratt analysis is that property, once taken away, can be fully recompensed later through post-deprivation money damages, while liberty, once taken, cannot be returned to the status quo ante because liberty cannot be adequately valued or measured. For example, a person struck by a policeman cannot be "unstruck," but if a policeman merely destroys the person's car, the car can be fully replaced by state tort law damages. This argument, suggested by Professor Irene Rosenberg in Ingraham v. Wright: The Supreme Court's Whipping Boy, 78 Colum.L.Rev. 75, 90-91 (1978), is contrary to elementary notions of tort law and was clearly foreclosed by Ingraham, supra
 
 
 [37]
 See also, e.g., Monaghan, Of "Liberty" and "Property", 62 Cornell L.Rev. 405, 431 (1977):
 [p]rior hearings might well be dispensed with in many circumstances in which the state's conduct, if not adequately justified, would constitute a common-law tort. This would leave the injured plaintiff in precisely the same posture as a common-law plaintiff, and this procedural consequence would be quite harmonious with the substantive view that the fourteenth amendment encompasses the same liberties as those protected by the common law.
 
 
 [38]
 See supra note 30
 
 
 [39]
 Logan v. Zimmerman Brush Co., 455 U.S. 422, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982), does not apply to the case before us because here the deprivation was not pursuant to an established state procedure. In Logan the plaintiff's chose in action for employment discrimination was destroyed by the Illinois Fair Employment Practices Commission because it negligently failed to hold a fact finding hearing within 120 days of the filing of plaintiff's complaint. The Illinois Supreme Court dismissed the discrimination charge because of the Commission's negligence, stating that plaintiff had no liberty or property interest in the chose in action as it was purely a grant from the legislature, which could provide for its extinguishment. Plaintiff then appealed to the U.S. Supreme Court
 The Supreme Court reversed. It relied on Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950), to hold that a chose in action is a property interest and the state had negligently destroyed it, thus violating plaintiff's fourteenth amendment due process right. According to the Logan Court, Parratt was inapposite. Parratt involved "a random and unauthorized act by a state employee, [and] not a result of some established state procedure." Logan 102 S.Ct. at 1158. In Logan, however, the state "by operation of law [destroyed the property, and] Parratt was not designed to reach such a situation." Id. See Smolla, supra note 13, at 859-62. The Logan Court also distinguished Ingraham. Ingraham differed from Logan because state tort remedies provided adequate post-deprivation process. The state system in Ingraham "preserved what 'has always been the law of the land' " while the property in Logan was terminated haphazardly by an established state procedure, "hardly a practice in line with our common-law traditions." Id. at 1158 n. 14.
 Summarizing the relationship of Parratt to Logan in his trenchant essay Professor Smolla stated:
 Random and unauthorized harm caused by the state, for which the state itself provides a remedy, does not implicate the Constitution. But when the state consciously enacts a system that places its imprimatur on arbitrary conduct ... through ... a capricious administrative structure for handling handicap discrimination, federal court intervention under the due process clause is warranted.
 Smolla, supra note 13, at 862.
 In the instant case, unlike the situation in Logan, the plaintiff did not prove a deprivation caused by an established state procedure. The deprivation was caused instead by an unpredictable and unauthorized act. Parratt shows that in such a case due process can be satisfied by an adequate post-deprivation hearing, e.g., a state tort suit.
 
 
 [40]
 Rochin v. California, 342 U.S. 165, 169, 172, 72 S.Ct. 205, 208, 96 L.Ed. 183 (1952). For an excellent discussion of the somewhat nebulous concept of substantive due process, see Barnier v. Szentmiklosi, 565 F.Supp. 869 (E.D.Mich.1983)
 
 
 [41]
 Rizzo v. Goode was a suit for equitable relief. Other courts have found the Rizzo analysis persuasive in claims for money damages, and we do also. E.g. Delaney v. Dias, 415 F.Supp. 1351, 1354 (D.Mass.1976); Leite, 463 F.Supp. at 590
 
 
 *
 See supra note 15. We do not read plaintiff's cross-appeal, and her briefs to us, as having embraced the district court's judgment for the City on counts two, three, and four. Therefore, we have not addressed the question of whether the City could have been held liable on any of these counts