Roy **HICKS**, Plaintiff,

v.

Robert C. **FEENEY**, Defendant.

Civ. A. No. 83–185 LON.

United States District Court, D. Delaware.

Nov. 8, 1984.

Joseph M. Bernstein, Wilmington, Del., for plaintiff.

Matthew J. Lynch, Jr., Dept. of Justice, Wilmington, Del., for defendant.

## OPINION

LONGOBARDI, District Judge.

This case is a civil rights action brought under 42 U.S.C. § 1983. The Plaintiff, Roy Hicks ("Hicks"), was formerly a patient at the Delaware State Hospital ("DSH"). The Defendant, Robert C. Feeney ("Feeney"), the director of the DSH, is a Defendant in both his individual and official capacities. The Plaintiff seeks declaratory and injunctive relief against the Defendant in his official capacity and compensatory damages from him as an individual.

The basis for the complaint is that Hicks was confined at DSH without legal authority and the confinement deprived him of a liberty interest in violation of the fourteenth amendment of the United States Constitution. The Plaintiff also alleges that even if his confinement by the hospital was entirely lawful, his fourteenth amendment liberty interest was still violated because he was not granted the least restrictive conditions of possible confinement.

### Background

Presently before the Court are cross motions for summary judgment. The facts underlying the claims are not in dispute. On November 18, 1982, the Plaintiff was found guilty of contempt of court by Family Court Judge Jay H. Conner. Judge Conner sentenced Hicks to 30 days in jail and suspended the sentence in favor of one year's probation. Two of the conditions of probation were that Hicks present himself at DSH for a period of 72 hours for evaluation and then follow the Hospital's recommendation for continued treatment or hospitalization. The commitment order signed by Judge Conner authorized Hicks to stay in DSH "for such time as may be permitted by law, unless sooner discharged according to law."

Hicks was sent directly to DSH from Family Court and arrived on the afternoon of November 18, 1982. Upon admission, he was examined by Dr. Felix Vergara and assigned to the Comegys Building. Shortly thereafter, he was examined by the forensic treatment team who concluded that the "court is to be informed of the situation that the patient needs some in-patient treatment gradually phased to an out-patient program."

On November 23, 1982, 5 days after Hicks' admission, Dr. Levy, a member of the forensic team, wrote to Judge Conner that Hicks required further evaluation at DSH. On November 24, Dr. Levy again wrote to the judge and stated that Hicks had "been exhibiting signs and symptoms of a major mental illness .... It is recommended that he receive further treatment ... by way of a Civil Commitment."

No formal action was initiated until almost 3 weeks later. On December 13, 1982, Dr. Levy prepared a certificate determining that Plaintiff was mentally ill. A verified complaint seeking a judicial determination of Plaintiff's mental status was signed by Defendant Feeney on December 20, 1982, and was filed in the Superior Court on December 27, 1982. The complaint noted that Hicks "was provisionally admitted as an involuntary mental patient on December 13, 1982."

On December 22, 1982, Hicks was transferred to the M–2 ward from the Comegys Building, a building designed to house criminals who were mentally disturbed.

After the complaint seeking a hearing on Hicks' mental status was filed on December 27, the Superior Court scheduled a probable cause hearing for January 14, 1983. That hearing never took place because the Plaintiff was discharged from the Delaware State Hospital on January 12, 1983.

### Statutory Involuntary Commitment Procedure

The Plaintiff contends that the events surrounding his stay at DSH must be examined in light of the provisions of the Delaware Involuntary Commitment Statute, 16 *Del.C.*, Ch. 50, and the fourteenth amendment. The Involuntary Commitment Statute limits the power of the State to involuntarily confine an individual in a

mental hospital, 16 *Del.C.* § 5002, and establishes a three step procedure for the involuntary commitment of an individual. The first step requires that an individual be provisionally admitted only pursuant to the particularized, written certification of a psychiatrist that the individual is mentally ill. 16 *Del.C.* § 5003.

If the provisional admission certificate is done by a psychiatrist other than an employee of the hospital, the hospital has 3 days to "independently determine whether or not the involuntary person is a mentally ill person."[1] 16 *Del.C.* § 5005(2). If the hospital then finds an individual to be mentally ill, it has "6 working days from the date of the provisional admission" to file a verified complaint seeking a judicial determination of the involuntary patient's mental status. 16 *Del.C.* § 5007(a). Judicial proceedings must begin no later than 18 working days from the filing of the complaint. 16 *Del.C.* § 5008(1). The proceedings begin with a probable cause hearing to determine whether an individual is legally being held at the hospital. Once probable cause is found by the court, a hearing to determine whether or not the patient is mentally ill must be held on the "earliest practicable date." 16 *Del.C.* § 5008(4).

### Contentions of the Parties

This statutory procedure was obviously not followed in Hicks' case. The provisional admission certificate was prepared 16 days after Hicks' admission rather than 3 days after admission as mandated by statute. 16 *Del.C.* § 5005. The verified complaint was filed 26 days after Hicks' admission rather than within 9 days as required by statute. 16 *Del.C.* § 5007. Hicks' probable cause hearing was scheduled 40 days after his admission rather than within 27 days as prescribed by statute. The Plaintiff maintains that the procedure followed

---

1. Section 5006 defines the rights of an individual whom the hospital has determined to be a mentally ill person. Such person is entitled to: (1) notice of the factual grounds upon which the proposed hospitalization is based; (2) a hearing and a judicial determination of whether the confinement is based upon probable cause and whether or not the involuntary patient is a mentally ill person; (3) representation by counsel at all judicial proceedings; (4) discovery proceedings and the right to summon and cross-examine witnesses and present evidence on his own behalf; and (5) a full record of the proceedings, including findings adequate for review.

deprived him of his fourteenth amendment interest in remaining free from unwarranted confinement in a mental hospital without due process of law. On the other hand, the Defendant maintains that Hicks' constitutional rights were not violated and that he is entitled to summary judgment on three grounds. First, he contends that the statutory commitment procedure was not necessary because Judge Conner had the legal authority to impose as a condition of Plaintiff's probation his compliance with the directives of the Delaware State Hospital and that the condition could include continuing hospitalization. Next, he states that even if the probation order could not properly authorize an indefinite stay, the Plaintiff has no cause of action because neither count of his complaint alleges a deprivation of due process actionable under 42 U.S.C. § 1983. Finally, he claims that even if a constitutional violation occurred, he is entitled to official immunity which bars the imposition of any monetary liability.

In deciding these motions for summary judgment, the Court is mindful of the clearly established summary judgment standard. Rule 56(c) of the Federal Rules of Civil Procedure provides that, upon motion of a party, summary judgment shall be granted if the record before the court shows that there is no issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The burden of proving that the standard has been met is on the moving party. In the instant case, where both sides have moved for summary judgment, the record reveals no material factual disputes between the parties.

### Requirements for a 1983 Action

■ In any section 1983 action, the initial inquiry must focus on two elements: (1) whether the conduct complained of was committed by a person acting under color of state law, and (2) whether the conduct deprived the person of rights, privileges or immunities secured by the Constitution or laws of the United States. *Parratt v. Taylor*, 451 U.S. 527, 535–36, 101 S.Ct. 1908, 1912–1913, 68 L.Ed.2d 420 (1981). In this case, Feeney, as director of the state mental hospital, was clearly acting under color of state law. Thus, the Court's inquiry must focus on whether his conduct deprived the Plaintiff of any rights protected by the Constitution or laws of the United States.

The Plaintiff has alleged violations of procedural and substantive due process rights under the fourteenth amendment. The Court will first address his procedural claim.

### Procedural Due Process

■ In order to prevail in an action alleging a violation of the fourteenth amendment right to procedural due process, a plaintiff must show:

(1) that the interest deprived was protected under the fourteenth amendment;

(2) that the deprivation was without due process; and

(3) that the charged defendant subjected the plaintiff or caused him to be subjected to the deprivation.

*Parratt v. Taylor*, 451 U.S. 527, 536–37, 101 S.Ct. 1908, 1912–13, 68 L.Ed.2d 420.

■ Both sides agree that the Plaintiff had a constitutionally protected liberty interest in remaining free from unwarranted hospitalization in a state mental hospital.[2] Also, there is no dispute that Feeney, as director of the DSH, was the person officially charged with the care and custody of the Plaintiff. If there was a deprivation of a liberty interest, Feeney would be the person held accountable. Thus, the question facing the Court is whether the deprivation of Hicks' liberty interest took place without due process of law.

**2.** Liberty interests may either originate in the Constitution or be created by state law. *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976). In *O'Connor v. Donaldson,* 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975), the Supreme Court clearly established that an individual has a constitutionally protected liberty interest in remaining free from unwarranted hospitalization in a state mental hospital.

The Defendant first contends that the Plaintiff's stay at DSH was not without due process of law because it was pursuant to a probation order of the Family Court. He maintains that the proceeding in which Hicks was found in contempt of court gave him all the process he was due prior to confinement at DSH. This argument has only a facial appeal. Even though an individual may be referred to a mental hospital for evaluation and treatment as a condition of probation, *United States v. Mercado,* 469 F.2d 1148 (2d Cir.1972), precedent suggests that an *indefinite* confinement in a mental hospital cannot be imposed as a condition of probation.[3] For example, in *McNeil v. Director, Patuxent Institution,* 407 U.S. 245, 92 S.Ct. 2083, 32 L.Ed.2d 719 (1972), the Court found that confinement in a mental hospital for observation and treatment cannot extend longer than an individual's sentence. Due process is denied when an individual is held on the basis of an *ex parte* order committing him for observation without the procedural safeguards commensurate with a long-term commitment. *Id.* at 250, 92 S.Ct. at 2087.

■ Even a prisoner is entitled to procedural protections including notice, an adversary hearing and counsel before he is involuntarily transferred from a prison to a mental hospital. *Vitek v. Jones,* 445 U.S. 480, 488, 100 S.Ct. 1254, 1261, 63 L.Ed.2d 552 (1979). Because the involuntary commitment to a mental hospital engenders a loss of liberty with greater constitutional implications than that occasioned by a prison sentence, even "a convicted felon ... is entitled to the benefit of procedures appropriate in the circumstances before he is found to have a mental disease and transferred to a mental hospital." *Id.* at 493, 100 S.Ct. at 1263.

■ Concern for protection of this liberty interest is heightened in a situation such as the one in which Mr. Hicks found himself. Judge Conner's only temporal limitation upon Hicks' stay was that he should remain in the hospital "as may be permitted by law." Unless that phrase is read to incorporate the limits of the Delaware Commitment Statute or at a minimum the constitutional right to a hearing before involuntary commitment, Hicks could have remained in the Hospital indefinitely.[4]

Faced with the relevance of the cited precedents and understanding now the jeopardy of liberty interests involved, it is not enough for a Family Court Judge to throw the onus of constitutional interpretation on the shoulders of lay people charged with the responsibility of carrying out his order. The words "as may be permitted by law" could have reasonably been interpreted as window dressing legalese without specific constitutional connotation to a non-lawyer. Under the circumstances of this particular case, there is no shelter from constitutional redress for any court merely to say "as may be permitted by law." In short, the requirements of procedural due process mandate reference to established commitment procedures if something more than a brief mental evaluation period is required when a judge imposes such a term of probation. To do otherwise denies a constitutionally protected liberty interest of the probated defendant without due process of law. The sentencing power of a judge, no matter how broad, does not abridge those rights.[5]

---

**3.** No cases have specifically dealt with this issue, a factor that is important in the later discussion of official immunity. *See,* pp. 1514 to 1515, *infra.*

**4.** Hicks was given a 30 day jail sentence yet he spent 54 days at the Delaware State Hospital.

**5.** Of course, the involuntary commitment procedures would not apply to situations where the mental status of the defendant is an issue in the case. A separate set of statutory guidelines applies to the situations where a judicial determination of the defendant's status has already been made. *See,* 11 *Del.C.* § 403 (verdict of "not guilty by reason of insanity"); 11 *Del.C.* § 404 (confinement of persons too mentally ill to stand trial); 11 *Del.C.* § 405 (confinement of persons who become mentally disabled after conviction but before sentencing).

These categories are recognized in the Delaware State Hospital manual which states that a court may commit an individual to the Delaware State Hospital under a court order for the following specific purposes: a pretrial investiga-

Clearly then, Hicks' initial appearance before Judge Conner and his sentencing on a contempt charge did not provide Hicks with adequate process to justify his indefinite commitment to a mental hospital. The Defendant maintains, however, that even if Hicks' confinement was not acceptable as a condition of his probation, his due process rights were not violated because numerous avenues of post-deprivation process were available to correct any procedural defect in his admission to DSH. Procedural due process requires that an individual be given the opportunity to be heard at a meaningful time and in a meaningful manner when the state deprives him of his life, liberty or property. *Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965). The Supreme Court has rejected the idea, however, that every deprivation must *be preceded* by such a hearing. The Court has recognized situations where post-deprivation hearings satisfy procedural due process requirements. *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); *Boddie v. Connecticut,* 401 U.S. 371, 379, 91 S.Ct. 780, 786, 28 L.Ed.2d 113 (1971). Post-deprivation hearings satisfy due process demands, for instance, when the exigencies of a particular situation make it impossible to provide a full and meaningful hearing prior to the deprivation. *Parratt,* 451 U.S. at 540–541, 101 S.Ct. at 1915–1916.

In *Parratt v. Taylor,* the Court found that the normal pre-deprivation notice and opportunity to be heard procedure may not be necessary where the state provides a post-deprivation remedy. This is particularly the case in situations where the deprivation occurred because of a random and unauthorized act and not because of any established state procedure. *Id.* at 538, 101 S.Ct. at 1914. *Parratt* concerned the rights of a prison inmate who sued prison officials on the ground that they had lost a hobby kit he had ordered. The kit was received by the prison but lost at some point before it could be given to Taylor. Taylor filed suit under section 1983, contending that he had been negligently deprived of property without due process of law. The Supreme Court agreed that the plaintiff had shown a deprivation of property under the fourteenth amendment yet denied Taylor's claim because he had not shown that the deprivation was without due process.

*Parratt* may be distinguished from this case in that it involved a property interest while this case involves a liberty interest. However, since the *Parratt* decision, a majority of courts have extended its analysis to situations involving a deprivation of a liberty interest.[6] *Rutledge v. Arizona Bd. of Regents,* 660 F.2d 1345, 1352 (9th Cir. 1981); *Daniels v. Williams,* 720 F.2d 792, 795 (4th Cir.1983); *Thibodeaux v. Bordelon,* 740 F.2d 329, 337 (5th Cir.1984); *Gil-*

tion to determine either fitness to stand trial or criminal responsibility; a presentence investigation to aid in the determination of the sentence; for treatment of a person found unfit to stand trial because of mental illness when a person is found not guilty on grounds of mental illness. Delaware State Hospital Regulation 12.6. Hicks does not appear to fall into any of these categories.

6. The arguments for not extending *Parratt* to liberty interests deserve a brief mention here. Some courts have suggested that extending *Parratt* beyond its facts would effectively impose an exhaustion requirement in section 1983 cases, a result forbidden in *Monroe v. Pape,* 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). See *Brewer v. Blackwell,* 692 F.2d 387, 394 n. 10 (5th Cir.1982); *Wakinekona v. Olim,* 664 F.2d 708, 715 (9th Cir.1981), *rev'd on other grounds,* 461 U.S. 238, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983).

This exhaustion requirement objection misperceives *Parratt's* import by confusing the rights accorded by the fourteenth amendment's due process clause with the remedy afforded by section 1983. *Parratt* did not deny Taylor a remedy; it defined his rights. The decision does not require that state remedies be exhausted. It held that no constitutional violation occurred. *Haygood v. Younger,* 718 F.2d 1472 at 1480.

Another objection to an extension of *Parratt* to liberty interests is that post-deprivation damages cannot fully compensate for a loss of liberty. *See, Ingraham v. Wright,* 430 U.S. 651, 701, 97 S.Ct. 1401, 1427–28, 51 L.Ed.2d 711 (1977) (Stevens, J., dissenting). This argument also fails. A loss is as incompensable under section 1983 as under state tort law. *Hudson v. Palmer,* — U.S. ——, 104 S.Ct. 3194, 3204, 82 L.Ed.2d 393 (1984).

*mere v. City of Atlanta,* 737 F.2d 894, 908 (11th Cir.1984); *Wolf-Lillie v. Sonquist,* 699 F.2d 864, 871 (7th Cir.1983); *Ellis v. Hamilton,* 669 F.2d 510, 515 (7th Cir.), *cert. denied,* 459 U.S. 1069, 103 S.Ct. 488, 74 L.Ed.2d 631 (1982); *Juncker v. Tinney,* 549 F.Supp. 574, 576 (D.Md.1982); *Barnier v. Szentmiklosi,* 565 F.Supp. 869, 877 (E.D. Mich.1983); *Hickman v. Hudson,* 557 F.Supp. 1341, 1347 (W.D.Va.1983); *Eberle v. Baumfalk,* 524 F.Supp. 515, 517–18 (N.D.Ill.1981). The *Parratt* decision itself implies that such an extension is appropriate by its citation to *Ingraham v. Wright,* 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977), a case involving a protected liberty interest. In *Ingraham,* the Court held that corporal punishment in schools administered without a prior hearing did not violate the students fourteenth amendment rights because "traditional common law remedies are fully adequate to afford due process." *Id.* at 672, 97 S.Ct. at 1413.

The more compelling evidence that *Parratt* applies to liberty interests, however, lies in the logic of the decision itself. The *Parratt* court found a post-deprivation remedy would have been impossible. Since the loss occurred "as a result of a random and unauthorized act by a state employee" the state could not "predict precisely when the loss will occur." 451 U.S. at 541, 101 S.Ct. at 1916. In such cases it is "not only impracticable, but impossible, to provide a meaningful hearing before the deprivation." *Id.*

■ This reasoning was expatiated in *Hudson v. Palmer,* —— U.S. ——, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). In *Hudson,* the Court extended *Parratt,* which concerned negligent deprivations of a prisoner's property by a state employee, to intentional deprivations of property.  ⸰

While *Parratt* is necessarily limited by its facts to negligent deprivations of property, it is evident ... that its reasoning applies as well to intentional deprivations of property. The underlying rationale of *Parratt* is that when deprivations of property are effected through

random and unauthorized conduct of a state employee, predeprivation procedures are simply "impracticable" since the state cannot know when such deprivations will occur. We can discern no logical distinction between negligent and intentional deprivations of property insofar as the "practicability" of affording pre-deprivation process is concerned. The State can no more anticipate and control in advance the random and unauthorized intentional conduct of its employees than it can anticipate similar negligent conduct ....

*Id.* 104 S.Ct. at 3203. Thus, it is this logic of *Parratt* that permits no principled distinction between deprivations of property and liberty interests. The relevant distinction is not between property and non-property deprivations but between isolated acts of misconduct which are not amenable to prior control and those deprivations resulting from established state procedure. *Daniels v. Williams,* 720 F.2d 792 (4th Cir.1983). If a deprivation results from a "random and unauthorized act" by a state official, the state is no more able to provide a pre-deprivation hearing when the deprivation involves a liberty interest rather than a property interest. *Juncker v. Tinney,* 549 F.Supp. at 576. Thus, post-deprivation remedies may suffice as procedural due process protection where the state itself had no control over the initial deprivation.

■ In the present case, Hicks' deprivation did not occur because of the "state system itself." The state system itself normally affords appropriate procedures to individuals such as Hicks, either through the Involuntary Commitment Statute, 16 *Del.C.,* Ch. 50, or through the usual categories of approved court ordered commitments. DSH Reg. 12.6. However, because of the failure of the Defendant to follow such procedures, Hicks fell through the cracks of the system and was never given a statutory hearing as to his mental status. Hicks lost his liberty not through the inade-

quacy of the state procedure but because that procedure was ignored.[7]

Once it is determined that the individual's deprivation of liberty resulted from a "random and unauthorized act by a state employee", the means of redress provided by the state must be evaluated in light of the requirements of the due process clause. *Cohen v. City of Philadelphia,* 736 F.2d 81 (3d Cir.1984). In the present case, Hicks had a wide variety of legal avenues available to him both to challenge his admission to DSH and to obtain damages for any wrongful acts by DSH. He could have moved for a new trial or appealed Judge Conner's decision to Delaware's Superior Court. Family Court Rules 280 and 300. Pending such appeal, Hicks could have sought a stay of the Family Court's order. Family Court Rule 300(e). He could also have sought post-dispositional relief after his time for appeal had expired. Family Court Rule 290. He could have sought the assistance of Family Court's probation department who could have altered the terms of his probation. Family Court Rule 270. In addition, *habeas corpus* relief was available to him under either 16 *Del.C.* § 5013 or 10 *Del.C.,* Ch. 69. These procedures alone satisfied Hicks' due process rights. As the Third Circuit stated in *Cohen v. City of Philadelphia,* 736 F.2d at 86, "substantive mistakes ... in applying local ordinances do not create a federal claim so long as correction is available by the state's judiciary." In addition to such procedural remedies, Hicks could have brought a suit for damages under state tort law.

■ Thus, the state provided adequate procedure to remedy any wrong the Plaintiff has suffered at the hands of a state employee. The state can do no more; it had no control over the Defendant's failure to follow the prescribed statutory procedures. And where the state can do nothing to provide an opportunity to be heard in advance, a chance to achieve redress after the deprivation has occurred must satisfy due process.[8] *Parratt* at 541.

### Substantive Due Process

■ The availability of state relief provided Hicks with ample procedure to protect his liberty interest under the fourteenth amendment. Thus, his right to procedural due process was not violated by Feeney's actions. However, Hicks has asserted that Feeney's actions violated his substantive due process rights as well. It is clear that unlike procedural rights, if substantive constitutional rights are violated, the constitutionally recognized deprivation is complete at the time of the action, irrespective of the procedures available before or after the deprivation. *Parratt* does not apply to substantive due process claims. *Duncan v. Poythress,* 657 F.2d

---

**7.** The Plaintiff contends that the exception to *Parratt* carved out in *Logan v. Zimmerman Brush,* 455 U.S. 422, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982), applies in this case. The Court strongly believes that it does not. *Logan* concerned an employee's charge filed with the Illinois Fair Employment Practices Commission alleging a wrongful discharge. The Illinois Fair Employment Statute gave the Commission 120 days within which to convene a fact-finding conference on the claim. However, through inadvertence, the Commission scheduled the fact-finding conference for a date 5 days after the expiration of the period. On appeal, the Supreme Court reversed the Illinois Supreme Court holding that the failure to comply with the 120 day requirement deprived the Commission of jurisdiction to consider the charge. The court found that the state system itself, *i.e.,* the state procedural rule, violated the complainant's due process rights because the state system itself destroyed "a complainant's property interest by operation of law whenever the Commission fails to convene a timely conference...." 455 U.S. at 436, 102 S.Ct. at 1158. *Logan* is distinguishable from *Parratt* and the present case because it condemned a defect in the state system *itself,* not a defect in the way the system was administered.

**8.** The Plaintiff maintains that pursuit of a post-deprivation state tort remedy would place an undue burden upon him since he would be forced to prove "gross or wanton negligence." This is not relevant to a determination of what process is due. Only a meaningful opportunity to be heard is required. *Parratt,* 451 U.S. at 540, 101 S.Ct. at 1915. The fact that the state remedies may not provide the individual with all the relief which would have been available under section 1983 does not mean that the state remedies do not provide due process. *Id.* at 544, 101 S.Ct. at 1917. *Daniels v. Williams,* 720 F.2d at 798.

691, 704 (5th Cir.1981); *Wolf-Lillie*, 699 F.2d at 871. However, Hicks' substantive due process claims are without merit and deserve only brief discussion.

■ Hicks asserts that he had a substantive liberty interest in the procedures of the Involuntary Commitment Act. The suggestion that state procedures can rise to the level of constitutionally protected interests was rejected by this district in *Brandywine Affiliate NCCEA/DSEA v. Brandywine Bd. of Ed.*, 555 F.Supp. 852 (D.Del.1983).[9] State procedural safeguards do not rise to the level of constitutionally protected interests.[10] "Although the existence of a liberty or property interest may be ascertained by reference to state law, once such an interest is identified, the task of defining the procedural protections which attach to that interest is wholly a matter of federal constitutional law ...." *Shango v. Jurich*, 681 F.2d 1091, 1097–98 (7th Cir.1982).

■ Thus, the fact that the exact procedures of the Involuntary Commitment Act were not followed in this case did not deprive Hicks of a substantive right protected by the constitution. The state statute may have helped define Hicks' liberty interest but the procedures which attach to that interest are created by the minimum due process requirements of federal constitutional law, not by the state statute itself. 681 F.2d at 1098.

9. In *Brandywine Affiliate*, the District Court of Delaware rejected a discharged teacher's claim that the statute describing termination procedure created a constitutionally protected interest in that exact procedure. The court acknowledged the constitutional interest in continued employment but refused to hold that the state procedures used to protect that interest were constitutionally protected in and of themselves.

10. The only exception to this rule is where "an individual has reasonably relied on agency regulations promulgated for his guidance or benefit and has suffered substantially because of their violation by the agency." *United States v. Caceres*, 440 U.S. 741, 752–53, 99 S.Ct. 1465, 1471–72, 59 L.Ed.2d 733 (1979). In this case, the Plaintiff was never expressly offered any assurances or reason to believe that his commitment would be in accordance with the procedures of

■ In Count II of his complaint, the Plaintiff asserts that the actions of the Defendant deprived him of his right as an involuntary mental patient to the least restrictive confinement consistent with professional judgment as guaranteed by the fourteenth amendment. In *Youngberg v. Romeo*, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), the Supreme Court held that a patient's constitutional right to reasonably non-restrictive conditions of confinement is not abridged as long as the confinement decision is made in the context of a professional judgment as to its necessity. *Id.* at 321, 102 S.Ct. at 2461.

In the present case, professional judgment was exercised in the decision to place the Defendant in the Comegys Building. The record indicates that Hicks was examined by a DSH doctor before being assigned to the Comegys Building. Therefore Hicks' substantive right to the least restrictive conditions of confinement was not violated.

*Immunity*

■ As the previous discussion indicates, the Court finds that Feeney did not deprive Hicks of any rights in violation of the due process clause of the fourteenth amendment. However, even if the Court had found that Hicks had stated a cognizable claim under the fourteenth amendment, Feeney would have been protected by qualified immunity in this case.[11] Qualified im-

the act. In fact, no evidence has been offered to show that he even knew of the act's existence.

11. The Court does not accept Feeney's argument that he is entitled to absolute judicial immunity because his actions were taken pursuant to judicial order. Although such judicial immunity has occasionally been extended to protect activities of individuals carrying out a "judicial function", see *Lockhart v. Hoenstine*, 411 F.2d 455 (3d Cir.1969); *Williams v. Wood*, 612 F.2d 982 (5th Cir.1980); *Slotnick v. Staviskey*, 560 F.2d 31 (1st Cir.1977), *cert. denied*, 434 U.S. 1077 (1978); *Fowler v. Alexander*, 478 F.2d 694 (4th Cir.1973), the scope of absolute immunity has recently been limited. In *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the Supreme Court established a stringent functional test for absolute immunity. In order to claim such immunity, an official must show that "the

munity is granted to state officials to allow them to conduct their day to day duties without the constant fear of incurring monetary damages liability. The important function of such immunity has created a strong presumption against monetary liability for state officials.

These principles are recognized in *Harlow v. Fitzgerald,* a recent Supreme Court opinion clarifying the scope of qualified immunity. Under the standard set forth in *Harlow,* immunity is available only to officials whose conduct conforms to a standard of objective legal reasonableness. *Id.* 457 U.S. 800 at 819, 102 S.Ct. at 2739. This standard mandates that an official is protected by qualified immunity except when his conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." 457 U.S. at 818, 102 S.Ct. at 2738.

Even if the Court had found that Feeney's actions violated Hicks' fourteenth amendment due process rights, his failure to institute commitment proceedings in no sense violated clearly established constitutional rights. In a recent decision, the Third Circuit defined "clearly established rights" for the purposes of qualified immunity. The court did not hold that precedent with an exact factual match to the situation at hand was necessary for a legal proposition to be considered "clearly established." The court held, however, that a proposition is not "clearly established" when there are no precedents on point and critical aspects of the case have not been subject to judicial scrutiny. *The People of Three Mile Island, et al. v. Nuclear Regulatory Commissioners,* 747 F.2d 139 at 148 (3d Cir.1984).

■ The Plaintiff in this case argues that all of the constitutional rights which the Plaintiff seeks to vindicate were clearly established as of November, 1982. He

cites *O'Connor v. Donaldson,* 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396, (right of patient not to be involuntarily confined unless he is "dangerous") and *Vitek v. Jones,* 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552, (due process requires hearing prior to involuntary commitment) as concrete examples. Certainly such rights were clearly established with regard to individuals who arrived at the hospital through different avenues than those upon which Hicks arrived. However, Hicks' presence at DSH came about because of the conditions of his probation. It is a well-accepted legal principle that terms of probation may impinge upon constitutional freedoms as long as the terms are reasonably related to rehabilitation and public safety. *United States v. Stine,* 675 F.2d 69, 71 (3d Cir.), *cert. denied,* 458 U.S. 1110, 102 S.Ct. 3493, 73 L.Ed.2d 1373 (1982); *United States v. Pierce,* 561 F.2d 735, 739 (9th Cir.1977), *cert. denied,* 435 U.S. 923, 98 S.Ct. 1486, 55 L.Ed.2d 516 (1978).

Title 10, section 942 of the *Delaware Code* gives the Family Court the power to place an individual on probation under "such terms and conditions as the court deems proper." In light of the Family Court's discretion and the fact that courts have consistently allowed wide latitude in the imposition of conditions of probation, it cannot be said that the constitutional rights of Hicks as a probationer were clearly established. There was no reason for the Defendant to know that the practice he followed with Hicks, who came to the hospital with a court order requiring him to comply with the recommendations of DSH as a condition of his probation, was violating any constitutional rights. Feeney simply treated the order as an acceptable condition of probation imposed by the Family Court and even contacted the Family Court

responsibilities of his office embrace a function so sensitive as to require a total shield from liability." *Harlow* at 813, 102 S.Ct. at 2736. As director of a state mental hospital, Feeney does not meet that burden. Feeney is simply an executive official of the state charged with carrying out the laws of the state with respect to

the involuntary commitments made under the act. The application of absolute immunity to Feeney's position would serve no necessary policy function since his position as Hospital Director is not "a function so sensitive as to require a total shield from liability." *Id.*

twice for guidance on what to do with Hicks.

As was the situation in *The People of Three Mile Island,* "this case is a far cry from situations involving a clearly established and well litigated general proposition in which the case at hand merely presents a new factual wrinkle." *Id.* at 148. There was no reason for Feeney to believe that his actions were improper. He had never encountered any situation where confinement to the hospital was not allowed as a condition of probation. Indeed, after a thorough search, this Court has found absolutely no precedent discussing analogous situations. Hicks' claim focuses on a complicated interplay between the constitutionally accepted discretion given judges in imposing conditions of probation and the constitutional limits on involuntary commitment to a mental hospital. It is a nether world of imprecise dimensions, the constitutionally approved powers of a judge and the constitutional protection of individual rights. Under such circumstances, Feeney had no obligation to predict the future course of constitutional law, *Pierson v. Ray,* 386 U.S. 547, 577, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967), and it would be unjust to deny him qualified immunity.

The Plaintiff goes on to claim that Feeney is not entitled to immunity because he violated clearly established "statutory rights." It is true that the *Harlow* court acknowledged that officials may lose their immunity by violating "clearly established

statutory ... rights." 457 U.S. at 818, 102 S.Ct. at 2738. However, the *Harlow* court was referring to *federal* statutory rights which formed the basis for the cause of action under section 1983 in that case.[12] Mere violation of a state statute that does not create a cause of action under 1983 cannot be used to overcome qualified immunity. *Davis v. Scherer,* —— U.S. ——, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984).[13] In this case, the Plaintiff claims that the failure to follow the procedures of the Involuntary Commitment Statute did implicate constitutional rights actionable under 1983. However, as the Court has already noted, the State Involuntary Commitment statute creates no such substantive rights actionable under section 1983. Therefore, in light of *Davis v. Scherer,* the fact that Feeney did not follow the procedures of the Delaware Involuntary Commitment Statute does not defeat his qualified immunity.[14]

For the foregoing reasons, the Defendant's motion for summary judgment is granted.

---

**12.** In *Maine v. Thiboutot,* 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980), the Supreme Court held that section 1983 creates a cause of action against state officials for violating federal statutes.

**13.** *Davis* involved a claim filed by a highway patrolman asserting that Florida officials had violated the due process clause of the fourteenth amendment by discharging him without a formal pretermination or a prompt post-termination hearing. Both the District Court and the Court of Appeals held that the officials could be sued because they had not followed "clearly established" administrative regulations in effectuating the discharge. The Supreme Court reversed and limited denial of qualified immunity to violations of law that formed the basis for the 1983 action. In *Davis,* the plaintiff had made

no claim that violation of the state administrative regulation implicated any constitutional rights actionable under 1983.

**14.** The Plaintiff relies heavily on *Scott v. Plante,* 691 F.2d 634 (3d Cir.1982) to illustrate that a violation of statutory procedure can serve to abrogate qualified immunity. In *Scott,* the Third Circuit stated that even if the precise dimensions of an individual's constitutional basis for recovery were unsettled at the time of the action, violation of statutory rights were enough to lose qualified immunity. 691 F.2d at 639. This ruling is obviously changed in light of the Supreme Court's subsequent opinion in *Davis* holding that violation of statutory rights cannot overcome qualified immunity unless the statute forms the basis of the action under section 1983.